Hoover WHITE, et al., Plaintiffs,

Ralph E. Bradford, etc., Mark G. Montiel, et al., Plaintiffs–Intervenors,

v.

The STATE OF ALABAMA; and James Bennett in his official capacity as Secretary of State for the State of Alabama, Defendants,

Christopher Boehm, Defendant–Intervenor,

United States of America, Amicus Curiae.

Civ. A. No. 94–T–94–N.

United States District Court, M.D. Alabama, Northern Division.

Oct. 6, 1994.

---

Terry G. Davis, Terry G. Davis, P.C., Solomon S. Seay, Jr., Montgomery, AL, Samuel H. Heldman, Joe R. Whatley, Jr., Cooper, Mitch, Crawford, Kuydendall & Whatley, Birmingham, AL, for Hoover White, John A. Dillard, Glenn Moody.

Algert S. Agricola, Jr., Montgomery, AL, for Ralph E. Bradford, Sr.

James McGowin Williamson, Williamson & Williamson, Greenville, AL, for Christopher Boehm.

Albert L. Jordan, Wallace, Jordan, Ratliff, Byers & Brandt, Birmingham, AL, for Johnny Curry, Jack Williams, Mark G. Montiel.

Robert Marc Givhan, Asst. Atty. Gen., Donald V. Watkins, Donald V. Watkins, P.C., Montgomery, AL, Jonathan C. Rose, Jones, Day, Reavis & Pogue, Washington, DC, for State of Ala.

Robert Marc Givhan Asst. Atty. Gen., Montgomery, AL, Jonathan C. Rose, Jones, Day, Reavis & Pogue, Washington, DC, for James Bennett.

Steven H. Rosenbaum, James P. Turner, U.S. Dept. of Justice, Civ. Rights Div., Voting Section, Mark A. Posner, U.S. Dept. of Justice, Civ. Rights Div., Washington, DC, Kenneth E. Vines, Charles Redding Pitt, U.S. Atty., Montgomery, AL, Matthew G. Olsen, U.S. Dept. of Justice; Civ. Rights Div., Deval L. Patrick, U.S. Dept. of Justice, Civ. Rights Div., Sp. Litigation Section, Washington, DC, for U.S.

## MEMORANDUM OPINION AND ORDER

MYRON H. THOMPSON, Chief Judge.

In this lawsuit, three African–American plaintiffs—Hoover White, John A. Dillard, and Glenn Moody—claim that the current at-large system of electing Alabama appellate judges violates § 2 and § 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. §§ 1973, 1973c (West 1994).[1] They name as defendants the State of Alabama and its Secretary of State. The plaintiffs invoke the jurisdiction of the court pursuant to 28 U.S.C.A. §§ 1331, 1343(3) (West 1993) and 42 U.S.C.A. § 1971(d) (West 1994). The plaintiffs represent all African–American electors and resident citizens in Alabama.

In settlement of this litigation, the plaintiffs and the defendants have submitted to the court a proposed final judgment for approval under Rule 23(e) of the Federal Rules of Civil Procedure.[2] For the reasons that follow, the court concludes that it should approve and adopt the proposed judgment.

### I. A BRIEF OVERVIEW

The proposed final judgment provides for temporary relief that promises to afford to the black citizens of this state their right to an equal opportunity to participate in the political process and elect candidates of their choice to appellate judgeships. At the same time, the proposed judgment will serve two important and substantial state interests: first, it will preserve the state's at-large system of electing appellate judges; and, second, it will allow the 1994 elections and future elections for all existing appellate judgeships to proceed even though some of the judgeships were created without the required federal approval.

In broad terminology, the proposed judgment achieves these ends by modifying the already existing and frequently used procedure under which persons, and almost exclusively white persons, have been appointed by

---

1. The plaintiffs also claim that the system violates the fourteenth and fifteenth amendments to the United States Constitution, as enforced by 42 U.S.C.A. § 1983 (West 1994).

2. Rule 23(e) of the Federal Rules of Civil Procedure provides: "A class action shall not be dismissed or compromised without the approval of the court, and notice of the proposed dismissal or compromise shall be given to all members of the class in such manner as the court directs."

the governor to appellate judgeships and thereby have enjoyed the privilege and advantage of incumbency before having to stand for election. The proposed judgment extends to minority-preferred candidates—who are the candidates of choice for blacks but need not themselves be black—a special and expanded opportunity to enjoy this privilege and advantage before having to stand for election. Thus, under the proposed final judgment, the governor—based on recommendations from a special nominating committee, composed in a manner to attempt to reflect the interests of most African–American Alabamians—would appoint minority-preferred candidates to a limited number of appellate judgeships. These appointed judges would then, like all other judges, have to stand for the approval of the electorate at large. In order to make this expanded opportunity of incumbency realistically available to minority-preferred candidates within a reasonable period of time, the proposed judgment provides for an increase in the size of the courts of criminal and civil appeals. It also provides for a possible temporary increase in the size of the state supreme court.

The proposed final judgment is not without opposition. On the one side, there are those who claim, among other things, that modifying the at-large system is inadequate. Three plaintiff-intervenors, on behalf of all Alabama Republicans, and one African–American intervenor claim that the only appropriate relief would be to transform the state's scheme for electing appellate judges from an at-large system to single-member districts, in which each appellate judge or justice would represent only a geographic portion of the state and in which district lines would then be drawn according to the race of voters. According to these objectors, this single-member scheme would provide African–Americans a greater assurance of being able to elect candidates of their choice. On the other side, there are those who claim that the court should not modify the at-large system in any manner. Yet all the objectors must recognize that without the temporary relief now before the court, the 1994 elections would probably not be able to proceed for some of the appellate positions and, as a result, these positions would be removed

from the electorate with the current incumbents holding over.

For the reasons given in this opinion, the court concludes, first, that the evidence supports a settlement of the plaintiffs' claims and, second, that the court should proceed cautiously at this time and adopt the relief suggested by the plaintiffs and the defendants. Their relief holds out a substantial promise of success and yet is minimally race-conscious and governmentally intrusive. This relief, like the relief for which the three Republican intervenors and the one African–American intervenor want to hold out, would afford a substantial promise to open up fully the state's political process to its African–American citizens; however, this relief, unlike the relief the intervenors want, would be only temporary, would preserve the state's at-large system, and would with certainty allow the 1994 elections to go forward for all appellate judgeships. The proposed settlement would also make only limited and necessary changes to state law and would not violate federal statutory or constitutional law.

It may be, as feared by some of the objectors, that the proposed judgment will not open up the political process. But, as is shown below, the proposed judgment—which has the express support of many prominent black political officials in the state and the implicit support of the overwhelming majority of black citizens in the state—does not foreclose the opportunity for the court to revisit, after a reasonable period of time, the question of the adequacy of relief.

Admittedly, some, but not all, judges appointed under the proposed judgment would enjoy incumbency for six years before having to go before the voters to retain their offices. However, this period of incumbency, while extended, is not greatly out of line with state practice, when that practice is viewed over the entire period in which blacks have allegedly been denied an equal opportunity to elect candidates of their choice. For example, within the last 30 years, one appellate judge served two successive appointive terms totalling almost four years and three other appellate judges served appointive terms of approximately two and a half years. Indeed,

one of the objectors to the proposed settlement—a white Republican, who was first appointed to the trial bench and then appointed to the appellate bench—is now eligible for retirement benefits for his years on the appellate bench without ever having won election to a judicial seat. Moreover, as will be shown below, the evidence reflects that current racial barriers " 'will not wither away of their own accord,' " *United States v. Paradise,* 480 U.S. 149, 163, 107 S.Ct. 1053, 1062, 94 L.Ed.2d 203 (1987) (plurality opinion) (quoting *Paradise v. Prescott,* 585 F.Supp. 72, 75 (M.D.Ala.1983)), and that, if these barriers are to be not only overcome but effectively eliminated over time, this extended period of incumbency is necessary, albeit only as part of a temporary measure.

It is also significant that, if the court were to reject the settlement and, as appears reasonably likely, elections could not proceed for a number of federally-unapproved appellate positions, the judges who occupy those positions could enjoy unelected incumbency for up to six years. For example, in the neighboring State of Georgia, it has been almost six years since many judgeships, for which the required federal approval had not been given, have been up for election. *Brooks v. State Bd. of Elections,* 848 F.Supp. 1548, 1551 (S.D.Ga.1994). The Georgia judiciary was recently described as "an overworked judiciary frozen in its current form." *Id.* at 1573. Therefore, with or without the proposed settlement, the State of Alabama will probably face judges with extended unelected incumbency. Indeed, it appears that one of the Alabama judges who might enjoy this extended incumbency in the absence of the settlement received his position by appointment. In order to avoid the situation in Georgia and in order to open up further the political process to Alabama's black citizens, the court today affirms the State of Alabama's choices as embodied in the proposed settlement.

The court therefore finds that the relief is fair, adequate, and reasonable, as well as legal and good public policy.

**II. BACKGROUND**

In the last 125 years, only two African-Americans have served as appellate judges in Alabama.[3] As of the 1990 census, however, blacks comprised 25.26% of the population of Alabama, 22.73% of the voting age population, and 20.29% of the total registered voters.[4] The stark disparity between the small number of black appellate judges and the large black population is the essence of this lawsuit.

Alabama's history of racial discrimination generally, and in the area of voting in particular, is well-documented in decisions of this court and others. African-Americans have been discriminated against in almost every area of Alabama public life. *Dillard v. Crenshaw County,* 640 F.Supp. 1347, 1359–60 (M.D.Ala.1986) (citing numerous cases finding racial discrimination in Alabama). The state has had an "unrelenting historical agenda, spanning from the late 1800's to the 1980's, to keep its black citizens economically, socially, and politically downtrodden, from the cradle to the grave." *Id.* at 1357. No area has been more problematic for African-Americans than achieving voting rights and access to the political process. *See id.* at 1356–59 (describing state's history of voting discrimination).

This case presents the first voting rights challenge to Alabama's appellate court system. Alabama's judicial system contains three appellate courts: a supreme court, a court of criminal appeals, and a court of civil appeals. Ala. Const. art. VI, § 6.01(a). The Alabama Constitution further states that the number of judges on each of the three appellate courts is determined by the legislature. Ala. Const. art. VI, §§ 6.02(a), 6.03(a)–(b). Currently, there are nine justices on the supreme court. Ala.Code § 12–2–1 (1986). Each of the courts of appeals is composed of five judges. Ala.Code § 12–3–1 (Supp.1994). Appellate judges are elected statewide for a term of six years. Ala. Const. art. VI,

---

**3.** Stipulation 93 *in* Joint Evidentiary Record for Rule 23(e) Fairness Hearing filed on July 5 and September 13, 14, 16, and 21, 1994 (hereinafter Joint Record) at 21.

**4.** Stipulations 1–3 *in* Joint Record at 1.

§§ 6.13, 6.15. Vacancies are filled by gubernatorial appointment. Ala. Const. art. VI, § 6.14.

Of the seventeen appellate court judges currently sitting, only one, Associate Justice Ralph Cook, is black.[5] He was appointed to replace the only prior black justice, Associate Justice Oscar Adams, who was also appointed.[6] No other black has been an appellate judge since 1865.[7]

## A. Procedural History

The plaintiffs brought this lawsuit on January 27, 1994. Their complaint, as amended,[8] asserts two claims under the Voting Rights Act.[9] The first claim is that four acts of the state legislature regarding the state appellate courts violate § 5 of the Voting Rights Act, which provides that a covered jurisdiction shall not "enact or seek to administer any voting qualification or prerequisite to voting, or standard, practice, or procedure with respect to voting different from that in force or effect on November 1, 1964" without obtaining preclearance from the federal government. 42 U.S.C.A. § 1973c (West 1994). In 1964, the appellate court system in Alabama consisted of a three-judge court of appeals and a seven-judge supreme court. All of these judges were elected statewide. The § 5 claim centers on four post–1964 acts of the Alabama legislature concerning appellate judges. Those four acts adopted, among other provisions, the following changes in state law: (1) the supreme court was expanded to nine judges, 1969 Ala.Acts 602; (2) a three-judge court of criminal appeals and a three-judge court of civil appeals replaced the former court of appeals, 1969 Ala.Acts 987; (3) the number of judges on the court of criminal appeals was increased to five, 1971 Ala.Acts 3d Spec.Sess. 75; and (4) the court of civil appeals was expanded to five judges, 1993 Ala.Acts 346. The plaintiffs sought a declaratory judgment that the four acts are void because they were not precleared. They also sought injunctive relief against the enforcement of the acts.

The second claim is that the current system of statewide election of Alabama appellate judges violates § 2 of the Voting Rights Act, which forbids the "denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C.A. § 1973 (West 1994). The plaintiffs allege that the current statewide method of electing appellate court judges dilutes black voting strength, thereby denying African–Americans an equal opportunity to participate in the political process and elect candidates of their choice.

On April 15, 1994, in settlement of this litigation, the plaintiffs and the defendants submitted to the court a proposed final judgment. The day before, on April 14, the United States Attorney General had interposed an objection under § 5 to the four legislative acts in question.[10] The Attorney General further stated, however, that if this court approved and adopted the proposed judgment, she "would be prepared to grant the requisite preclearance."[11] In other words, the four acts would be unobjectionable if the additional changes contemplated by the proposed judgment were approved and adopted.

The Attorney General further noted that a three-judge court had been convened pursuant to 42 U.S.C.A. § 1973c (West 1994) and 28 U.S.C.A. § 2284 (West 1978 & Supp.1994) to hear the § 5 claim and thus was "poised to address the question whether injunctive relief should be granted based on the unprecleared status of appellate court judgeships

---

5. Stipulations 94, 96 in Joint Record at 21.

6. Stipulations 95–96 in Joint Record at 21.

7. Stipulation 93 in Joint Record at 21.

8. See amended complaint filed on February 16, 1994.

9. As stated, the plaintiffs also assert that the defendants violated the fourteenth and fifteenth

amendments, as enforced by 42 U.S.C.A. § 1983 (West 1994). See supra note 1.

10. Letter from Assistant Attorney General Deval L. Patrick to Alabama Attorney General Jimmy Evans, dated April 14, 1994 (file document no. 65).

11. Id. at 7.

that are up for election this year."[12] She therefore added that, because the "proposed consent judgment contemplates that elections will go forward this year under the at-large election system" and because "the Attorney General has precleared the changes occasioned by the proposed judgment and is prepared to preclear the legislative changes if the court grants its approval to the judgment," she "believe[d] that it would be appropriate to defer granting injunctive relief and thus allow the primary election for the unprecleared positions to be conducted."[13] The Attorney General advised, however, that, "Should the court not approve the judgment before this year's general election [in November 1994], the issue of granting injunctive relief should be revisited."[14]

On the basis of the Attorney General's conditional preclearance of the proposed judgment, the three-judge court issued an order on April 15, 1994, allowing primary elections for unprecleared state appellate judicial positions to go forward. The court agreed with the Attorney General that absent an "extreme circumstance," a district court must enjoin elections that would be conducted in violation of § 5's prohibition against implementation of unprecleared changes. *Clark v. Roemer*, 500 U.S. 646, 654, 111 S.Ct. 2096, 2102, 114 L.Ed.2d 691 (1991). Such a circumstance was presented because "the Attorney General has precleared the changes that would be effected by the proposed consent judgment and is prepared to preclear the legislative changes if the proposed judgment receives judicial approval" and the fact that "the proposed judgment contemplates that elections will go forward this year under the at-large election system."[15] As suggested by the Attorney General, however, the three-judge court cautioned that "if the proposed judgment does not receive judicial approval before this year's general election, the court should revisit the issue of whether injunctive relief would be appropriate."[16] Subsequently, in an order entered on May 11, 1994, the three-judge court stayed proceedings before it, severed the § 2 claim from the § 5 claim, and referred the proposed settlement to the single-judge court. *White v. State of Alabama*, 851 F.Supp. 427, 430 (M.D.Ala.1994) (three-judge court).[17]

Over the course of the proceedings a number of parties, in addition to the plaintiffs and the defendants, have become involved. The three-judge court granted the Department of Justice's motion for leave to participate as *amicus curiae*.[18] The three-judge court also granted a motion to intervene as a plaintiff by Ralph E. Bradford, an African–American seeking to remedy the alleged § 2 violation by replacing the at-large election system with single-member districts.[19] The single-judge court allowed the following persons, who are Republicans and not African–American, to intervene as plaintiffs in support of single-member districts: Mark Montiel, a judge on the court of criminal appeals and Republican candidate for supreme court in 1994; Johnny Curry, a state legislator and chairman of the Jefferson County Republican Executive Committee; and Jack Williams, executive director of the House Republican Caucus.[20] The court certified a class consisting of all Alabama electors who are Republican and a subclass consisting of all Alabama electors who are Republican and are not African–American, both classes to be repre-

---

12. *Id.*

13. *Id.* at 7–8.

14. *Id.* at 8.

15. Order of April 15, 1994, at 1–2 (three-judge court).

16. *Id.* at 2.

17. The three-judge panel based its May 11 decision on the limited jurisdiction of three-judge courts under § 5. Because the Attorney Gener-

al's action could potentially moot the preclearance questions, the only pressing issue was the proposed judgment. It is the responsibility of a single-judge court to rule on proposed remedies to voting rights violations under § 2. *White,* 851 F.Supp. at 429. If the single-judge court disapproves the settlement, then the three-judge panel would have to address again the § 5 claim and the need, if any, for injunctive relief. *Id.*

18. Order of March 4, 1994.

19. *Id.*

20. Order of June 6, 1994.

sented by Judge Montiel, Curry, and Williams.[21] The single-judge court also ordered that Christopher Boehm, who is not African–American, be allowed to intervene as a defendant supporting the current system of at-large elections.[22] The court certified a class consisting of all citizens who are qualified electors of the State of Alabama and are not African–American or black, which would be represented by Boehm.[23]

Meanwhile, concurrently with filing the proposed final judgment on April 15, 1994, the plaintiffs and the defendants requested approval of that agreement. The court subsequently entered an order preliminarily and conditionally approving the proposed settlement, subject to objections at a fairness hearing to be held on July 29, 1994.[24] The court also approved the proposed notice to the public, which the state was required to have published in major Alabama newspapers.[25] Twenty-nine people filed written objections and three of those objectors spoke at the July 29 fairness hearing. One of the written objections came from a named intervenor. In addition to the written and oral objections, all of the intervenors object to at least portions of the settlement for reasons that overlap with those of the objectors. The objections break down into ten categories. First, several people supported single-member districts as a remedy. Second, some people objected to using an appointment procedure rather than electing judges. Third, a number of objectors decried what they saw as an attempt to place black judges on the bench through affirmative action procedures. Fourth, some people believed the settlement violates Alabama law and objected that the state attorney general does not have the power to make such a settlement. Fifth, some people felt the settlement is collusive or politically motivated. Sixth, four prisoners objected, stating that any settlement should include restoration of direct appeal rights, a new appeal, and the right to file a motion for a new trial. Seventh, two people had proce-

dural objections to the court's jurisdiction. Eighth, one person objected to the possibility of the chief justice appointing associate justices. Ninth, one person said the judgment lasted too long. And tenth, one person said the judgment should last longer.

The court also received a joint evidentiary record for the fairness hearing that was prepared by all of the parties, including the intervenors, and that was filed with the court in parts on July 5 and September 13, 14, 16, and 21, 1994. After the hearing, the court certified a plaintiff class consisting of all black resident citizens and electors of the State of Alabama, with the class represented by White, Dillard, and Moody.[26] On September 2, 1994, the court held a subsequent hearing with expert witnesses for the purpose of obtaining clarification on a number of issues. At the court's request, the parties submitted additional evidence on some of these issues.

## B. *Provisions of the Settlement*

In general terms, the proposed judgment would implement a remedy that remains within the framework of statewide elections historically used for selecting appellate judges in Alabama, while allowing minority-preferred candidates, who can be either black or non-black, to run for election with the benefit of incumbent status. It would allow the 1994 elections to go forward under existing state law, even though portions of that law have not been precleared. The proposed judgment would terminate in the year 2019, though the court could terminate it earlier if the objectives have been achieved. The judgment could also be extended if necessary. If, in the year 2003, the objectives of the proposed settlement are not being met, the parties must first attempt to agree on a further remedy; failing that, the plaintiffs may petition the court for additional relief. The specifics of the proposed judgment are different for the courts of appeals and the supreme court.

21. Order of June 22, 1994.

22. Order of May 24, 1994.

23. Order of June 22, 1994.

24. Order of May 17, 1994.

25. *Id.*

26. Orders of May 17 and August 11, 1994.

#### 1. *Courts of Appeals*

The proposed settlement would make the following changes to the current method of selecting judges for the courts of appeals: Prior to 1997, the state will add two judges to each of the court of criminal appeals and the court of civil appeals, for a total of seven judges on each court. The four new judges, who will be seated in January 1997, will be chosen through procedures set forth in the proposed settlement. These procedures provide for the creation of a nominating commission composed of one member selected by the Alabama Lawyers Association; one member selected by the Alabama State Bar Association; two members selected from the plaintiff class by class counsel; and one member selected by majority vote of the other four members or, in the event of deadlock, by the Alabama Black Legislative Caucus. The commission will select three attorney applicants to nominate for each judgeship. The governor will then choose an appointee for each judgeship from the three nominees for that judgeship. Each of the four judges will be appointed for a term of six years.

After the new appointments, if there is a vacancy on either the court of criminal appeals or the court of civil appeals and there are fewer than two members of such court who are black or who were appointed through the nominating process, then the vacancy will be filled by the same method of nomination. Rather than serve a full six year term, however, such appointees will be subject to election after serving one year, in accordance with the constitutional provision for filling vacancies. Ala. Const. art. VI, § 6.14.

#### 2. *Supreme Court*

The nominating commission will also be used to fill positions on the supreme court, but in a different way. Starting in 1995, if there are fewer than two associate justices of the supreme court who are black or who were appointed through the nominating process, then any vacancies will be filled through the same nominating process used for vacancies on the courts of appeals. Appointees to vacant positions will be subject to election after one year.

For each of the elections in 1996, 1998, and 2000, if there are fewer than two associate justices of the supreme court who are black or who were appointed through the nominating process, then if any sitting associate justice does not qualify for reelection, that open seat will be filled through the nominating process for a term of six years. In each of 1998 and 2000, if there are fewer than two associate justices who are black or who were appointed through the nominating process and no sitting associate justice fails to qualify for reelection, then the state will create an additional seat on the supreme court, which will be filled through the nominating process for a term of six years. If there are more than eight associate justices on the supreme court, any seat vacated by an associate justice who is not black or appointed through the nominating process will not be filled.

#### 3. *Evolution of the Settlement*

The proposed final judgment currently before the court is not the first settlement to be submitted by the plaintiffs and the defendants. Their first proposal was submitted on February 24, 1994. The current proposal and the original proposal differ in many important respects. First, the original proposal provided that only blacks would be eligible for appointment. The current agreement removes all racial prerequisites to appointment. Second, the original proposed judgment provided that appointments would be triggered if two African–Americans were not sitting on each appellate court. The current proposal provides for appointments if there are fewer than two judges or justices who are black or who were appointed through the nominating process. Because there will be two initial appointments to both of the courts of appeals and because these appointments need not be black, future appointments to vacancies on these courts will not depend wholly on the race. The trigger for initial appointments to the supreme court will remain dependent on race because there will be no initial appointments like the courts of appeals. Third, if the number of associate justices is increased pursuant to the provisions of the judgment,

the original proposal abolished a seat if it was vacated by a white justice. The current proposal abolishes the seat if the vacating justice is white or if the seat was not filled by the judicial nominating commission. Fourth, the original proposal provided for discussions about further remedial measures if there are fewer than two African–Americans on any of the appellate courts for more than a year after 2003. The current proposal triggers this provision only if there are fewer than two judges or justices who are black or who were appointed through the nominating process. Fifth, the original settlement provided that the first white supreme court justice who vacated office would be replaced by a black, irrespective of the number of black justices then serving on the court. This provision has been eliminated in the current proposal. Sixth, the original proposal was of unlimited duration. The current proposal is limited to 24 years unless extended by the court. It also explicitly allows the state to petition for earlier termination of the judgment.

Subsequently, the parties made two further changes. The first change was in response to concerns raised by the Boehm defendant class on behalf of all white electors of the state. Counsel for the Boehm class wrote that, "After evaluating the current state of the record before this Court and evaluating the prospects of litigation if the proposed consent judgment is not approved, the 'Boehm Class', in large measure, *supports* the proposed consent judgment." [27] Counsel added, however, "that this Court can and should use its equitable power to make minor adjustments to the proposed consent judgment to ensure current and future constitutional protection for the 'Boehm Class'." [28] Counsel explained that the nominating commission "would contain a mini-

mum of three and, possibly, a maximum of five African–American members," [29] with the result that there is the "potential of having *no* non–African–American and the probability of having only one" on the commission. [30] Similarly, the Alabama State Bar passed a resolution taking issue with the proposed settlement only with regard to the nominating commission in two respects: first, that the members of the commission should be chosen by and not necessarily have to come from certain groups; and, second, that the members should be chosen by predominantly black groups other than Alabama Black Legislative Caucus and other than counsel for the named plaintiffs. [31]

The court agreed with some of the concerns raised by the Boehm class and the State Bar, and, therefore, at the urging of the court, the plaintiffs and the defendants modified the requirements for the composition of the nominating commission. There will still be two members selected from the plaintiff class by class counsel. The other three members, however, will no longer be selected *by and from* the predominantly black Alabama Lawyers Association; *by and from* the Alabama State Bar Association; and by majority vote of the other four members or, in the event of deadlock, *by and from* the Black Legislative Caucus. Each of the three members will be selected only *by* these organizations, further eliminating race-based measures because the members of the commission will not have to be members of the Alabama Lawyers Association and, in the event of deadlock, the Black Legislative Caucus. Each of these three members may therefore be of any race. [32]

The second modification suggested by the court was made to avoid unnecessary

**27.** Defendant-intervenor Boehm's memorandum filed on July 13, 1994, at 2–3 (emphasis added).

**28.** *Id.* at 3.

**29.** *Id.* at 4.

**30.** *Id.* at 6–7.

**31.** Resolution passed by the Alabama State Bar on May 13, 1994, and filed with the court on May 18, 1994.

**32.** The fact that two of these groups are predominantly black should not, by itself, be of serious concern. White candidates seeking to be a member of the nominating commission should feel no more constrained and limited in opportunity before a predominantly black group than black candidates would feel in coming before a predominantly white group.

changes in state law. The plaintiffs and the state agreed to eliminate a provision that allowed the chief justice to make appointments should the governor fail to do so.

The final version of the proposed judgment was filed on September 15 and precleared on September 20, 1994.[33] It is, therefore, the result of an extended process in which all concerned—the plaintiffs, the defendants, the intervenors, and other interested persons and groups—were invited to work together to find a remedy to racial discrimination that is dominantly race neutral and fits as much as possible into the historical framework for statewide elections, and that, to the extent it is race-conscious and governmentally intrusive, is so in only a temporary and reasonably narrow way.

### III. STANDARDS FOR REVIEW

■ The court has previously explained the standards for deciding whether to approve a settlement in a voting rights class-action case. *Dillard v. Crenshaw County,* 748 F.Supp. 819, 823 (M.D.Ala.1990). Judicial policy favors voluntary settlement as the means of resolving class-action cases. *Cotton v. Hinton,* 559 F.2d 1326, 1331 (5th Cir. 1977).[34] The court has applied this policy to voting rights class actions. *See, e.g., Crenshaw County,* 748 F.Supp. at 823; *Dillard v. Town of Louisville,* 730 F.Supp. 1546, 1548 (M.D.Ala.1990); *Harris v. Graddick,* 615 F.Supp. 239, 241–42 (M.D.Ala.1985). It is also established, however, that the settlement process is subject to abuse and, therefore, courts must independently evaluate whether a settlement is fair, adequate, and reasonable. *Piambino v. Bailey,* 757 F.2d 1112, 1139 (11th Cir.1985), *cert. denied,* 476 U.S. 1169, 106 S.Ct. 2889, 90 L.Ed.2d 976 (1986); *Pettway v. American Cast Iron Pipe Co.,* 576 F.2d 1157, 1169 (5th Cir.1978), *cert. denied,* 439 U.S. 1115, 99 S.Ct. 1020, 59 L.Ed.2d 74 (1979). For instance, the interests of the class and its lawyer may diverge, or some members of the class may be "sold out" by other members. *Pettway,* 576 F.2d at 1169.

As part of determining fairness, adequacy, and reasonableness, the court must ensure that the settlement is not collusive. *Piambino,* 757 F.2d at 1139. Finally, the court has the duty of ensuring that the settlement is not illegal or against public policy. *United States v. City of Alexandria,* 614 F.2d 1358, 1362 (5th Cir.1980); *Harris,* 615 F.Supp. at 241–42.

### IV. WHETHER THE SETTLEMENT IS FAIR, ADEQUATE, AND REASONABLE

■ In deciding whether a settlement is fair, adequate, and reasonable, a court may examine the following factors: (1) the views of the class members; (2) the views of class counsel; (3) the substance and amount of opposition to the settlement; (4) the possible existence of collusion behind the settlement; (5) the stage of the proceedings; (6) the likelihood of success at trial; (7) the complexity, expense, and likely duration of the lawsuit; and (8) the range of possible recovery. *See Leverso v. Southtrust Bank of Alabama, Nat. Assoc.,* 18 F.3d 1527, 1530 n. 6 (11th Cir.1994); *Bennett v. Behring Corp.,* 737 F.2d 982, 986 (11th Cir.1984); *Crenshaw County,* 748 F.Supp. at 823.

### A. *Views of Class Members*

■ The first place a court should look to determine whether a settlement is fair, adequate, and reasonable is to the views of the class. *Shuford v. Alabama State Bd. of Educ.,* 846 F.Supp. 1511, 1517 (M.D.Ala. 1994). As a preliminary matter, the court must ensure that class members have been given notice of the settlement, as required by Rule 23(e) of the Federal Rules of Civil Procedure. In this case, a court-approved notice was published twice weekly for three weeks in major Alabama newspapers. The notice summarized the proposed settlement and advised interested persons about how to object in writing and at the fairness hearing. The court held a fairness hearing to obtain

---

**33.** Notice of the September 20 preclearance was filed with the court on September 21, 1994.

**34.** In *Bonner v. Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit handed down prior to the close of business on September 30, 1981.

the views of both class and non-class members. The court finds that the notice and fairness hearing were adequate to inform the plaintiff class and other interested parties about the proposed settlement and to seek and ascertain their opinions.[35]

Based on the lack of objections, the court concludes that the plaintiff class overwhelmingly supports the proposed settlement. *Cf. Reynolds v. King,* 790 F.Supp. 1101, 1109 (M.D.Ala.1990) (majority's silence may be, but is not always, indicative of class-wide support). Only two objections came from people who identified themselves as African–American. One of these objectors argued for a remedy of single-member districts, but supported the nominating commission in the alternative. The second black objector is plaintiff-intervenor Bradford, who opposes the settlement on a number of grounds, including that the settlement is illegal and that the remedy should be single-member districts.

The court also received evidence from the plaintiff class in regard to the proposed settlement. A number of prominent African–Americans support the proposed settlement. Among them are Oscar Adams, the first black associate justice on the Alabama Supreme Court and the only black person ever elected statewide to a constitutional office in Alabama, albeit after a period of incumbency;[36] Fred Gray, a prominent black attorney and former state representative;[37] Richard Arrington, Jr., the African–American mayor of Birmingham;[38] and Joe L. Reed, chair of the Alabama Democratic Conference, a black political organization, and a veteran of Alabama politics.[39] These four men cited a number of reasons for supporting the proposed settlement. Mayor Arrington indicated that the nominating commission is a good way of identifying minority-preferred candidates who can be elected statewide after appointment.[40] Gray and Reed suggested that black attorneys are reluctant to run for appellate judgeships without the advantage of incumbency.[41] Justice Adams emphasized the importance of incumbency in allowing him to win statewide races.[42] He stated that, "Incumbency is the best method ... to overcome the reluctance on the part of many white voters to vote for a black candidate."[43] Adams believes that the best "way of remedying any underrepresentation of blacks in appellate judgeship positions would be through an appointment process comparable to that contained in the proposed consent judgment."[44] He further added that "the settlement in this case does the best possible job of preserving the interests of the State in the judicial system."[45]

Particularly because there have been only two objections by members of the plaintiff class, the court does not believe that the proposed final judgment is unfair to any segment of the black population.[46] No money damages are at stake and all black voters are treated equally. Because there is no conflict of interest within the class which would elevate in importance the views of a small segment of the class, majority opinion is compelling. *Pettway,* 576 F.2d at 1217.

---

**35.** The notice was given before the modifications to the proposed judgment on September 15, 1994. The court has previously held that "narrow" changes to a proposed settlement that "clearly" do not in any way "impair" the rights of interested persons do not require additional notice. *Harris,* 615 F.Supp. at 244. These circumstances apply here. Nevertheless, if any of the parties or intervenors want supplemental notice given about the modifications, the court will do so and consider any objections. A request for such notice should be made within 14 days.

**36.** Adams Aff. *in* Joint Record at 58.

**37.** Gray Aff. *in* Joint Record at 62.

**38.** Arrington Aff. *in* Joint Record at 42.

**39.** Reed Aff. *in* Joint Record at 37.

**40.** Arrington Aff. *in* Joint Record at 44–45.

**41.** Gray Aff. *in* Joint Record at 66; Reed Aff. *in* Joint Record at 36.

**42.** Adams Aff. *in* Joint Record at 50–51.

**43.** *Id.* at 58.

**44.** *Id.* at 57.

**45.** *Id.*

**46.** *See Shuford,* 846 F.Supp. at 1519 & n. 16; *Crenshaw County,* 748 F.Supp. at 824 ("noteworthy that only two members of the plaintiff class have objected").

Based on the paucity of objections and the strong support for the proposed judgment among African–American leaders, the court finds that the plaintiff-class favorably views the proposed settlement.

## B. *Views of Class Counsel*

In considering the fairness, adequacy, and reasonableness of a proposed settlement, a court should also consider the views of counsel for the class. *Pettway,* 576 F.2d at 1215. Class counsel for the plaintiffs have argued that the proposed settlement is fair, adequate, and reasonable. These attorneys are experienced civil rights and voting rights lawyers and the court respects their views.

## C. *Substance and Amount of Opposition to the Settlement*

█ A number of objections have been raised to the proposed settlement. The bulk of the objections relate to the legality of the proposed settlement and are dealt with in a later section. The court will, therefore, limit this section to the objections relevant to fairness, adequacy, and reasonableness.

One objection is that the proposed remedy is not the most appropriate one. Most people holding this view propose single-member districting as a solution.[47] The court is persuaded, however, that the proposed remedy is at least as good for African–Americans as any alternative remedy.[48] According to Mayor Arrington and Reed, the proposed settlement is superior to single-member districts for appellate courts because at-large seats allow blacks to have a significant influence on all appellate judges, rather than have their dominance limited to a small number of districts with little presence in the majority of the districts.[49] Gray also supports the proposed settlement rather than a single-member districting scheme.[50] He reasons that the proposed settlement would allow African–Americans

"to have a voice in the initial appointment of at least two persons of choice on each appellate court be they Black or white. At the same time the proposed judgment retains the rights of Blacks to equally share in the election of all of the other members of the court." [51]

This evidence mirrors a debate among courts and scholars over the best remedy for voting discrimination. In response to the predominance of single-member districts as a voting rights remedy, some courts and scholars have argued that districting is not the best method of ensuring minority interests are taken into account. *See, e.g., League of United Latin American Citizens v. Clements,* 999 F.2d 831, 872–73 (5th Cir.1993) (en banc), *cert. denied,* —— U.S. ——, 114 S.Ct. 878, 127 L.Ed.2d 74 (1994); Lani Guinier, *No Two Seats: The Elusive Quest for Political Equality,* 77 Va.L.Rev. 1413, 1447–57 (1991). As the Supreme Court summed up the dilemma, the creation of majority-minority districts "does not invariably minimize or maximize minority voting strength." *Voinovich v. Quilter,* —— U.S. ——, ——, 113 S.Ct. 1149, 1156, 122 L.Ed.2d 500 (1993). "Instead," the Court continued, "it can have either effect or neither." *Id.* "On the one hand, creating majority-black districts necessarily leaves fewer black voters and therefore diminishes black-voter influence in predominantly white districts," *id.,* while, "On the other hand, the creation of majority-black districts can enhance the influence of black voters" by ensuring they can elect candidates of their choice. *Id.* One important question is whether minority voters are better off when they have *"influence* over a greater number of seats, or *control* over a lesser number of seats." *Holder v. Hall,* —— U.S. ——, ——, 114 S.Ct. 2581, 2595, 129 L.Ed.2d 687 (1994) (Thomas, J., dissenting). *But see* Guinier, *supra,* at 1457–58 (rejecting both alternatives).

---

**47.** Cumulative voting has also been proposed. For reasons why it was rejected, see *infra* Part V.C.2.a.

**48.** *See also infra* Part V.A.5 (discussing state interest in at-large system); *infra* Part V.C.2.a (discussing race-conscious nature of districting).

**49.** Arrington Aff. *in* Joint Record at 43–44; Reed Aff. *in* Joint Record at 34–36.

**50.** Gray Aff. *in* Joint Record at 62–65.

**51.** *Id.* at 68.

The court need not resolve this dilemma because the parties have expressed their preferences in the proposed settlement. The court need only observe that single-member districts are not necessarily the best solution in all cases. It is true that minorities have often sought single-member districts as a voting rights remedy. Nevertheless, the court finds it entirely reasonable that in this case, involving a statewide appellate judicial system rather than a legislative body, single-member districts are not in the best interests of blacks where, as it appears under the proposed final judgment, there exists an alternative scheme that in substantial measure achieves the goals of districting without sacrificing minority influence in the state as a whole. The proposed settlement might not be optimal for some groups of people, but it appears to be a fair way of remedying past discrimination against African–Americans. Further, the appointment remedy avoids "marginalizing" those black and white voters who would end up a minority in race-based districts.

█ Another objection is that it is unfair to use an appointment procedure rather than electing judges.[52] Admittedly, under the proposed judgment four to six appellate judgeships will be appointed.[53] However, the settlement partially disperses the effect of this procedure on candidates and on the voters at large by adding four judges to the courts of appeals. Therefore, either with or without the settlement, candidates will still be able to run for and voters will still be able to vote for the same number of positions on those two courts, even though with the settlement the absolute right to vote for and run for every position may be hampered. Additionally, because the need for any appointments to open or created seats on the supreme court is only conditional, it is possible

that all supreme court seats can be filled without impinging on the right to election. Further, each Alabama citizen will still be electing more judges than if single-member districts were imposed. Finally and most importantly, each of the appointed positions will ultimately come up for election. Citizens will have the last word on judges through the ballot.[54]

To be sure, some appointed judges would enjoy incumbency for six years before having to stand for election. This period of incumbency is not greatly out of line with state practice, when that practice is viewed over the entire period in which blacks have allegedly been denied an equal opportunity to elect candidates of their choice. The evidence reflects that within the last 30 years, one appellate judge served two successive appointive terms totalling almost four years[55] and three other appellate judges served appointive terms of approximately two and a half years.[56] Indeed, one objector to the proposed settlement—Judge Montiel, who was first appointed to the trial bench and then appointed to the appellate bench— is now eligible for retirement benefits for his years on the appellate bench without ever having won election to a judicial seat.[57] Moreover, as discussed later, if the current racial barriers to black participation in the election of appellate judged are to be not only overcome but effectively eliminated over time, this extended period of incumbency is necessary.

It is also significant that, with or without the proposed settlement, the State of Alabama will probably face judges with extended unelected incumbency. That is, if the court were to reject the settlement and, as appears reasonably likely, elections could not proceed for a number of unprecleared appel-

---

52. In this portion of the opinion, the court addresses fairness and reasonableness questions related to appointment. The legality questions are dealt with later.

53. Because vacancies are filled by appointment under current law, the proposed settlement only impinges on elections for the two newly created judgeships on each of the courts of appeals and potentially for two open seats or newly created judgeships on the supreme court.

54. For a more detailed examination of how the appointment remedy affects the right to vote for judges, see *infra* Part V.A.4.a.

55. Joint Record at 450.

56. *Id.* at 447–48.

57. *Id.* at 449; defendants' submission filed on September 16, 1994.

late positions, the judges who occupy those positions could enjoy unelected incumbency for up to six years. In the neighboring State of Georgia, it has been almost six years since many unprecleared judgeships have been up for election. *Brooks v. State Bd. of Elections*, 848 F.Supp. 1548, 1551 (S.D.Ga.1994). The Georgia judiciary was recently described as "an overworked judiciary frozen in its current form." *Id.* at 1573. The effect on Alabama's appellate system could be comparable. In the 1994 election alone, the election for the supreme court seat held by Justice Hugh Maddox and arguably for the seats held by Justices Ralph Cook and Mark Kennedy would be subject to stay; the election for the court of criminal appeals seat held by Judge Mark Montiel [58] and arguably for the seat held by Judge Bill Bowen would be subject to stay; and the election for the court of civil appeals seat held by Chief Judge William Robertson and the two seats added in 1993 would be subject to stay. Future elections for at least one supreme court seat, one court of criminal appeals seat and two court of civil appeals seats would also be subject to stay. This potential disruption absent the settlement cannot be ignored.

■ Some people have expressed concern about the length of the proposed settlement. The court finds that the 24–year time period is reasonable. The proposed judgment can be extended or shortened by the court if circumstances warrant. Moreover, as is explained later in this memorandum opinion, 24 years are needed to effect a change in the composition of the court.[59] For the judgment to be fully successful, changes must take place in voting behavior. Further, of the 26 appointees to appellate courts since 1968, only two have been black.[60] Twenty-four years is therefore a reasonable period of time to allow for the political process to open up.

■ Finally, four prisoners objected, maintaining that, because legislative acts concerning the court of criminal appeals had not been precleared, the affirmance of their convictions was invalid. They argued that any settlement should include restoration of direct appeal rights, a new appeal, and the right to file a motion for a new trial. This argument is unpersuasive. Action taken by courts does not become retroactively invalid because the courts have not been precleared. "Granting such a remedy would result in the reversal of years of convictions, the overturning of myriad judgments; in short, it would create genuine chaos." *Brooks v. State Bd. of Elections*, 775 F.Supp. 1470, 1482 (S.D.Ga. 1989) (three-judge court), *aff'd mem.*, 498 U.S. 916, 111 S.Ct. 288, 112 L.Ed.2d 243 (1990).

### D. *Existence of Collusion*

■ Objections have been raised that the settlement was a product of collusion between counsel for the plaintiffs and the defendants. It should be noted that the charge is not the typical claim of collusion in a class case: that the class counsel or the named plaintiffs benefit from the settlement at the expense of the class or some members of the class. *See, e.g., Holmes v. Continental Can Co.*, 706 F.2d 1144, 1147–48 (11th Cir.1983); *Reynolds*, 790 F.Supp. at 1105–08. Rather, the charge of collusion seems to be based on the presumption that, because the settlement was reached quickly, the parties did not conduct settlement talks as adversaries. There is no evidence, however, that the parties engaged in illegal negotiations to reach the proposed settlement. To the contrary, the parties maintain that they engaged in arms-length negotiations.[61] Although the settlement does not include the typical relief for a § 2 violation—that is, single-member dis-

---

**58.** Indeed, it appears that Judge Montiel, who was appointed, could enjoy extended incumbency in the absence of the settlement.

**59.** *See infra* Part V.C.2.b.

**60.** Joint Record at 447–50. Justice Cook's appointment is not included in the record, but is one of the 26 noted by the court.

**61.** The director of the Alabama Judicial Study Commission, Robert A. Martin, who was involved to a great extent with this litigation is aware of no collusion. Martin Aff. *in* Joint Record at 403–04, 405–06.

tricts—the plaintiffs did not ask for this remedy in their complaint, as amended.[62]

Though politics may have been a factor in the proposed judgment, which arguably preserves the strength of Democrats to a greater degree than would single-member districts, there is no suggestion that the state wanted the suit to be brought. Had some state officials encouraged this suit to avoid the legislative process and achieve a result they desired, the court would be concerned. *Cf. United States v. Johnson,* 319 U.S. 302, 63 S.Ct. 1075, 87 L.Ed. 1413 (1943) (per curiam) (suit collusive if it is not adversary). All the evidence suggests, however, that the state was satisfied with the current at-large system of electing appellate judges and that the proposed settlement is the way the state attorney general sought to preserve that system to the greatest extent possible.[63] Furthermore, this lawsuit did nothing to prevent Republicans from raising claims against at-large elections as currently organized and as proposed under the settlement. In a separate opinion issued today, *White v. State of Alabama,* 867 F.Supp. 1571 (M.D.Ala.1994), the court discusses in depth the Republican claims of political discrimination under *Davis v. Bandemer,* 478 U.S. 109, 106 S.Ct. 2797, 92 L.Ed.2d 85 (1986).

### E. *Other Factors*

■ The remaining four factors are interrelated: the stage of the proceedings; the likelihood of success at trial; the complexity, expense, and likely duration of the lawsuit; and the range of possible recovery. This litigation has been ongoing for less than a year. An early settlement has the potential for substantial cost savings. On the other hand, without a full understanding of a case's potential, parties can settle for less or more than they should. This possibility does not appear to be a problem in this case. Voting rights actions are frequent enough and counsel in this case are experienced enough, that the potential gains of this action are well known. Future revelations are unlikely. The parties are fully aware that the plaintiffs have a substantial likelihood of prevailing on the merits of the § 2 claim.[64] But this result would probably come at quite a cost in time and effort to the parties, as well as disruption to the state court system. Two current challenges to the at-large election of judges that have not settled have gone on for over half a decade with no end in sight. *Southern Christian Leadership Conference of Alabama v. Evans,* 785 F.Supp. 1469 (M.D.Ala. 1992), *judgment vacated,* 18 F.3d 897 (11th Cir.), *vacated and reh'g en banc granted,* 18 F.3d 897 (11th Cir.1994) (Alabama trial judges) (filed 1988 and still ongoing); *Brooks v. State Bd. of Elections,* 848 F.Supp. 1548 (S.D.Ga.1994) (Georgia judicial system) (filed 1988 and still ongoing). In contrast, the proposed settlement allows the 1994 election and future elections to continue on schedule. Any relief the plaintiffs eventually received through trial would likely come after a long struggle and would probably not be significantly better than that afforded by the proposed settlement.

In light of the above considerations, the court has independently evaluated the fairness, adequacy, and reasonableness of the proposed settlement. "A settlement is in large measure a reasoned choice of a certainty over a gamble, the certainty being the settlement and the gamble being the risk that comes with going to trial." *Paradise v. Wells,* 686 F.Supp. 1442, 1446 (M.D.Ala. 1988). As a result, the question is not "whether the proposed consent decree is the

---

**62.** Some might argue that the very absence of a request for single-member districts suggests that the plaintiffs and the defendants discussed the shape of the action in advance of its filing. Parties often approach each other before bringing suits to see if an agreement can be worked out. A rule that prevented this would be unwise. Additionally, the plaintiffs' suit did not preclude others from intervening or bringing their own claims for single-member districts, both of which have occurred.

**63.** Evans Aff. *in* Joint Record at 397–99; *see also* Martin Aff. *in* Joint Record at 406–07.

**64.** *See infra* Part V.C.1.c. Even if the plaintiffs had a relatively weak claim, this would not necessarily militate against the settlement. As the Eleventh Circuit has explained, a district court may conclude "that the plaintiff class would have difficulty succeeding on the merits," yet still find "the settlement to be in the best interests of the class." *Behring,* 737 F.2d at 987.

best deal possible" but whether it is "at a minimum, fair, adequate, and reasonable." *Id.* at 1448. Based on the views of class counsel and prominent members of the class, the court believes that the proposed settlement will benefit African–Americans. This conclusion springs from the court's beliefs, based on evidence, that the appointment process will produce quality minority-preferred candidates who would otherwise not choose to run for statewide office and that the advantages of incumbency will allow minority-preferred candidates to achieve election after appointment, thereby allowing black voters greater influence.[65]

The court realizes that this result is by no means guaranteed. The proposed settlement risks the possibility of appointees consistently losing elections. On the other hand, this system has the potential for achieving a result that is much more satisfying than single-member districts: as whites become used to seeing blacks in important statewide positions, race will hopefully decrease as a factor in voting. Single-member districts do not necessarily hold out this hope in as short a time period. Thus the proposed judgment is fair to the state as a whole. It represents an answer to the conflicting views found in a recent redistricting case, *Johnson v. Miller*, 864 F.Supp. 1354 (S.D.Ga.1994) (three-judge court) (per curiam). The majority of the court in that case held the Georgia congressional districting plan unconstitutional and stated: "The time has come to contemplate more innovative means of ensuring minority representation in democratic institutions." *Id.* at 1393. The dissent, on the other hand, argued that "the Constitution does not condemn all race-conscious districting." *Id.* at 1397 (Edmondson, J., dissenting). The court is presented with a proposed settlement that, while race-conscious, achieves in an innovative manner minority access to the political process without the drawbacks of single-member districts.

Finally, the court, as will be discussed below, finds that the plaintiffs have a good chance of proving a § 2 violation in the meth-

od of electing appellate judges. However, the court finds it entirely reasonable that the plaintiffs wish to settle now in light of the lengthy litigation currently ongoing in Alabama and elsewhere over elected judges. This settlement avoids the expense and delay of complex voting rights litigation. Based on the above considerations, the court finds that the proposed final judgment is fair, adequate, and reasonable.

## V. WHETHER THE SETTLEMENT IS LEGAL AND GOOD PUBLIC POLICY

The court must also address whether the proposed judgment is legal. Opponents contend that the settlement is illegal because it contravenes state law, § 2 of the Voting Rights Act, and the equal protection clause. The court does not agree and concludes upon review that the proposed settlement is legal and good public policy.

### A. *Whether the Settlement Violates State Law*

The court turns first to the contention that the proposed settlement should not be approved because it conflicts with state law. The first issue for analysis is whether the court has the authority to examine state law issues at all. After finding that it does, the court turns to the state attorney general's authority to enter into a settlement modifying state law absent a finding of liability. After satisfying itself that the settlement is properly before it, the court examines its power to approve a settlement that changes state law. Finally, the court analyzes the specific modifications to state law contemplated by the proposed settlement.

#### 1. *Whether the Court has Authority to Consider State Law*

Before analyzing the extent to which any invalidation of state law affects the proposed judgment, the court must address a threshold issue of its authority to conduct such an examination. The plaintiffs and the defendants argue that the United States

---

**65.** The evidence shows that incumbent appellate judicial candidates overwhelmingly achieve reelection. Martin Aff. *in* Joint Record at 644–45.

For additional discussion of the advantages of incumbency, see *infra* Part V.A.4.a.

Constitution's eleventh amendment guarantee of sovereign immunity restricts the court's inquiry into the extent to which the proposed settlement conforms to state law as a basis for denying approval to the proposed judgment.[66] This contention is untenable. It is true that "a claim that state officials violated state law in carrying out their official responsibilities is a claim against the State that is protected by the Eleventh Amendment." *Pennhurst State School & Hosp. v. Halderman*, 465 U.S. 89, 121, 104 S.Ct. 900, 919, 79 L.Ed.2d 67 (1984). The word "claim" in this holding, however, refers to a cause of action in a suit, not just any assertion about the law by a party. *See id. Pennhurst* does not hold that the eleventh amendment prevents federal courts from considering state law as a factor in evaluating a settlement, even if those same issues could not be raised as a cause of action.

██ Even assuming that the court is unable to examine state law issues in the course of evaluating a settlement generally, under eleventh amendment jurisprudence Congress may still abrogate sovereign immunity in certain situations. For instance, because the enforcement powers given to Congress in the fourteenth amendment limit state authority, laws enacted pursuant to the fourteenth amendment have been viewed as falling outside the limits of the eleventh amendment. Thus, in *Fitzpatrick v. Bitzer*, 427 U.S. 445, 456, 96 S.Ct. 2666, 2671, 49 L.Ed.2d 614 (1976), the Supreme Court allowed an action against a state under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C.A. §§ 2000e to 2000e–17; *see also Hutto v. Finney*, 437 U.S. 678, 693–98, 98 S.Ct. 2565, 2575–77, 57 L.Ed.2d 522 (1978) (attorney's fees under Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C.A. § 1988, upheld against state). Like the fourteenth amendment, the fifteenth amendment affords

Congress enforcement power. The Voting Rights Act was passed pursuant to the enforcement authority of the fifteenth amendment. *State of South Carolina v. Katzenbach*, 383 U.S. 301, 308, 86 S.Ct. 803, 808, 15 L.Ed.2d 769 (1966). Just as laws such as Title VII passed pursuant to the fourteenth amendment trump the eleventh amendment, so does the Voting Rights Act. *See id.* at 325, 86 S.Ct. at 817 (fifteenth amendment "supersedes contrary exertions of state power"); *City of Rome v. United States*, 446 U.S. 156, 178–80, 100 S.Ct. 1548, 1562–63, 64 L.Ed.2d 119 (1980) (federalism overridden by legislation enforcing fifteenth amendment). There is no eleventh amendment bar to a federal court examining the extent to which a voting rights settlement conforms to existing state law.[67]

2. *Whether the State Attorney General Has Authority to Enter into a Settlement Modifying State Law*

██ Opponents of the proposed settlement contend that the attorney general cannot agree to modifications in state law to settle this case absent a finding by the court that the state has violated federal law. *See Brooks*, 848 F.Supp. at 1563 (attorney general permitted to settle in violation of state law only if federal liability determined); *see also League of United Latin American Citizens*, 999 F.2d at 845–47.

██ The Alabama Supreme Court has held that "the attorney general has the power to manage and control all litigation on behalf of the State of Alabama." *Ex parte Weaver*, 570 So.2d 675, 684 (Ala.1990). This power at a minimum includes the ability to settle a case if the settlement does not conflict with state law. *State ex rel. Carmichael v. Jones*, 252 Ala. 479, 41 So.2d 280, 285 (Ala.1949). Assuming that the proposed set-

---

**66.** The eleventh amendment provides: "The judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by citizens of another state, or by citizens or subjects of any foreign state." U.S. Const. amend. XI. This language has been construed to apply to citizens suing their own state. *Hans v. State of Louisiana*, 134 U.S. 1, 10 S.Ct. 504, 33 L.Ed. 842 (1890).

**67.** This conclusion is consistent with the Supreme Court's emphasis on deferring to state policy to the extent possible in cases in which the district court must impose a remedy for § 2 violations. *Upham v. Seamon*, 456 U.S. 37, 40–43, 102 S.Ct. 1518, 1521–22, 71 L.Ed.2d 725 (1982) (per curiam).

tlement does conflict with some aspects of state law, the court must conduct further analysis into the attorney general's power to settle cases. It is important to note that *Jones* dealt with a state law claim rather than a federal one. In a federal suit, the attorney general must be cognizant not only of violations of state law but federal law as well. It is basic constitutional law that "the Supremacy Clause invalidates all state laws that conflict or interfere with an Act of Congress." *Rose v. Arkansas State Police,* 479 U.S. 1, 3, 107 S.Ct. 334, 335, 93 L.Ed.2d 183 (1986) (per curiam). Therefore, if the attorney general believes that state law violates federal law, his duty is to uphold federal law. *See Delchamps, Inc. v. Alabama State Milk Control Bd.,* 324 F.Supp. 117, 118 (M.D.Ala. 1971) (three-judge court) (per curiam). If a state admits it is violating federal law, it would be a waste of time and resources for the court to hold a trial merely to give the attorney general the power to settle on a remedy changing state law. Since most § 2 remedies involve changes to state or local law, requiring a court finding of liability would effectively destroy the strong policy in favor of settlement in such cases. For this reason, the attorney general must have the power to enter into a settlement that alters state law if liability is admitted when the purpose is to correct federal law violations.[68]

■■■ This lawsuit has the added complication that the state does not admit liability. There are numerous cases that hold, however, that a jurisdiction is not required to admit liability to settle litigation. Recent Eleventh Circuit Court of Appeals decisions in the employment discrimination area suggest that it is not required that "a city settling litigation by consent decree declare *itself* to have violated the law." *In re Birmingham Reverse Discrimination Employment Litig.,* 20 F.3d 1525, 1539 (11th Cir.1994); *see also*

*Ensley Branch, NAACP v. Seibels,* 31 F.3d 1548, 1557–58 (11th Cir.1994). Likewise, requiring a jurisdiction to admit liability before settling a voting rights action would thwart the strong policy in favor of settlement. The attorney general need not admit liability in order to settle a § 2 case that modifies state law as long as there is sufficient evidence to support the alleged § 2 violation.[69] *See Moch v. East Baton Rouge Parish School Bd.,* 533 F.Supp. 556, 559–60 (M.D.La.1980) (§ 2 consent decree in case that modified state law approved with provision denying liability).

Finally, there is no state law prohibiting state officials from entering into a settlement, which although in conflict with state law, resulted from a good faith federal challenge to a state law or practice. In such a circumstance, for this federal court to hold that a state election system can be changed only after trial and that state officials cannot save the state the expense of litigation by reaching a settlement would be presumptive. In this situation, a federal court should show deference to the state interests articulated and advanced by those state officials who are properly before the court on behalf of the state as an entity.

3. *Whether the Court Has Authority to Approve a Settlement that Modifies State Law*

■■■ The court is satisfied that it can examine state law and that the proposed settlement is properly before it. The next question is whether the court has the authority to approve a settlement that changes state law. Outside of the context of approving a settlement, courts have broad power to remedy violations of the federal Constitution. A federal court, for instance, can order taxes to be raised above a state-mandated limit to remedy a violation of the fourteenth amend-

---

68. Although it can be argued that this ability to settle gives the attorney general too much power to unilaterally change state law, there are countervailing factors that convince the court that the power is adequately checked. For instance, the Fifth Circuit has held that the attorney general cannot ignore the views of state officials he represents. *League of United Latin American Citizens,* 999 F.2d at 842–43; *see also Weaver,* 570

So.2d at 684 (governor may intervene to take contrary position to attorney general).

69. Once again, it can be argued that the authority to make this determination gives the attorney general too much power. However, the attorney general does not have the final word on whether evidence supports liability. In approving a settlement, courts must make that determination.

ment. *Missouri v. Jenkins,* 495 U.S. 33, 57, 110 S.Ct. 1651, 1666, 109 L.Ed.2d 31 (1990). More specifically, the Eleventh Circuit has recognized the broad equitable powers of district courts in voting rights cases. *Dillard v. Crenshaw County,* 831 F.2d 246, 248 (11th Cir.1987). The Voting Rights Act implicitly assumes that federal courts will have the power to change state election systems; otherwise, there would be a right without a remedy. Thus, if a court determines that there is a § 2 violation, it may impose a remedy that overrides state law. *See Upham v. Seamon,* 456 U.S. 37, 40–42, 102 S.Ct. 1518, 1521, 71 L.Ed.2d 725 (1982) (per curiam).

■ The relief a court can provide through approving a proposed settlement is at least as broad as the relief it can award after trial. *Local Number 93 v. City of Cleveland,* 478 U.S. 501, 525, 106 S.Ct. 3063, 3077, 92 L.Ed.2d 405 (1986). If a federal court can order a state to adopt a voting plan that conflicts with state law, then it certainly can approve a judgment in which the state voluntarily adopts changes in its laws to comply with federal law. This court held in a previous voting rights suit that government bodies can be restructured through a settlement "in a manner other than that prescribed by state statutory and constitutional law." *Crenshaw County,* 748 F.Supp. at 828. Other courts have reached similar conclusions about their ability to approve voting rights remedies that modify state law. *Armstrong v. Adams,* 869 F.2d 410, 414 (8th Cir.1989) ("Any limitation of power imposed by state law on the Board of Election Commissioners [to call the new election in the consent decree] is vitiated by the authority of the district court to remedy constitutional violations."); *Moch,* 533 F.Supp. at 561 (district court approved consent decree arrived at by school board defendant and other parties in § 2 case implementing election plan that temporarily modified state law).

■ In approving changes to state law, however, a federal court must be cau-

tious. After all, the United States Constitution gives states the power to regulate elections and decide how state officials are chosen. *Sugarman v. Dougall,* 413 U.S. 634, 647, 93 S.Ct. 2842, 2850, 37 L.Ed.2d 853 (1973). Yet state autonomy cannot get in the way of remedying voting discrimination. *Katzenbach,* 383 U.S. at 325, 86 S.Ct. at 817; *City of Rome,* 446 U.S. at 178–80, 100 S.Ct. at 1562–63. In light of federalism concerns, however, the court has a duty to ensure that the proposed settlement conforms with state law except to the extent the evidence justifies modifications to fulfill the purpose of remedying discrimination. Indeed, for this reason, the plaintiffs and the defendants here removed a provision in the proposed judgment that would have given the chief justice power to appoint judges and justices if the governor failed to do so. In examining the remaining modifications to state law, therefore, the court must be mindful both of whether they are necessary to fulfill the objectives of the settlement and of the extent of the change.

### 4. *Whether the Modifications to State Law Require the Court to Disapprove the Settlement*

The proposed final judgment entails four arguable changes in state law: (1) introducing an appointment procedure for some judicial seats; (2) denying candidates the right to run for certain judgeships; (3) expanding the size of the appellate courts; and (4) infringing on the governor's power to appoint judges.

#### a. *Appointment Instead of Election*

■ The change to an appointment procedure infringes in a limited way on the right of Alabama voters to elect judges.[70] The state constitution provides for election of all judges. Ala. Const. art. VI, § 6.13. The proposed judgment allows for appointments to vacancies, created seats, and open seats. A nominating commission is set up to facilitate the process.[71] It is important to under-

---

**70.** There is no federal right to elect judges. *Chisom v. Roemer,* 501 U.S. 380, 401, 111 S.Ct. 2354, 2367, 115 L.Ed.2d 348 (1991).

**71.** There is no reason to believe that the use of a nominating commission is itself violative of state law. Nominating commissions for judges are

stand, however, what the proposed judgment does not change. In the case of vacancies, the constitution already mandates appointment. Ala. Const. art. VI, § 6.14. Any provisions of the settlement regarding appointments to fill vacancies, therefore, do not infringe on the right to elect judges. Newly created judgeships have been filled by appointment pursuant to legislative act.[72] It is true that prior appointments have not been for full terms. The difference is merely a matter of degree, however. The state constitution requires that "judges shall be elected by vote." Ala. Const. art. VI, § 6.13. Taken literally, all created seats seemingly should be subject to election immediately.[73] The state legislature has not interpreted the constitution in this way. It is reasonable, therefore, to conclude that the appointment procedure for created seats does not conflict with state law.

Nevertheless, for purposes of further analysis, the court will assume that appointing judges for a full term to newly created seats does conflict with state law. *See Opinion of the Justices,* 357 So.2d 648, 649 (Al.1978). The court also assumes that the appointment of judges to open seats on the supreme court conflicts with state law.[74] However, based on the following analysis, the court finds that the scope of these violations is limited and the changes are necessary to fulfill the goal of remedying discrimination.

The proposed judgment temporarily removes from the elective process some newly created and open judicial seats. The scope of this provision is limited both by number and by time. No more than six appellate court seats at any one time can be filled through the appointment procedure.[75] Each of the courts of appeals will automatically get two appointees in 1997. The remaining two potential remedial seats, which are on the supreme court, might be filled by election or appointment to a vacancy before any open or created seats would be filled by appointment. Each appointee to an open or created seat will have to face election after six years. In addition, as explained earlier, this period of incumbency is not greatly out of line with state practice. Within the last 30 years, one appellate judge served two successive appointive terms totalling almost four years and three other appellate judges served appointive terms of approximately two and a half years. For these reasons, the court finds that the state law infringement is limited in scope.

These changes in state law are necessary to allow minority-preferred candidates the advantages of incumbency. Evidence before the court from Justice Adams and his campaign manager, J. Mark White, shows that incumbency is important in gaining election

---

currently being used in four Alabama counties. Joint Record at 432–43.

**72.** Martin Aff. *in* Joint Record at 409. Article VI, § 6.13 of the Alabama Constitution, which requires that all judges be elected, was ratified in 1973. The record contains numerous examples of newly created trial court judgeships that were appointed since 1973. Joint Record at 428–30. However, there have been no appellate court appointments to newly created seats since 1973. Nevertheless, because the state constitution does not distinguish between the right to vote for trial judges and the right to vote for appellate judges, evidence of trial court appointments is just as important.

**73.** Created seats do not fall within the exception allowing for gubernatorial appointment in the case of vacancy. Ala. Const. art. VI, § 6.14.

**74.** The court is aware of no precedent for making appointments to open seats instead of holding an election.

**75.** It is possible that the persons responsible for implementing the settlement could abuse it by appointing judges who would then step down in favor of new appointees. This would perpetuate appointees in derogation of the right to vote for judges. *See* brief of plaintiff-intervenors Bradford, Montiel, Curry, and Williams filed July 13, 1994, at 28. The remedy for this possibility is not to reject the settlement at this time. The court assumes as in any settlement that the parties will act in good faith. If it later appears that this assumption is in error, the court can then decide whether the settlement should continue to be enforced. *See Rufo v. Inmates of Suffolk County Jail,* 502 U.S. 367, ——, 112 S.Ct. 748, 760–61, 116 L.Ed.2d 867 (1992) (discussing modifications of consent decree). Any persons who abuse the process would also be subject to contempt of court.

to a judgeship.[76] The evidence also shows that a longer period of incumbency makes election easier than a shorter period.[77] And this appears to be not only important but critical in the case of black judges.[78] There is also evidence to support the view that serving six years rather than a lesser term is crucial to achieving the full effects of incumbency for blacks.[79] For instance, a longer period of time allows a candidate to raise more money, gain respect for decisions, and get to know lawyers.[80] A comparison of the first and second races of appointees demonstrates the importance of length of incumbency. Justice Adams, for instance, who was appointed in 1980, had a hard time winning his 1982 campaign but faced a less difficult race in 1988.[81] Similarly, Justice Gorman Houston, who was appointed in 1985, had a difficult race in 1986, but a comfortable one in 1992.[82] A comparison of these two races, however, further suggests that blacks are disadvantaged more than whites by short periods of incumbency. In his first race, Justice Adams faced a relative unknown with little support in the legal community; Justice Houston, in his first race, faced a successful lawyer supported by other attorneys.[83] Despite this relative advantage over Justice Houston, Justice Adams had a narrower victory.[84] In sum, the record supports the conclusion that a six-year term is important to afford appointees—in particular black appointees—to open and created seats the full advantage of incumbency.

Finally, infringing on the rights of voters in order to fulfill the purposes of the Voting Rights Act has precedent. The court has previously approved a settlement under which county commissioners, who are supposed to be elected under state law, were appointed instead as part of a temporary measure while the county moved from an at-large system to a single-member districting system. *Crenshaw County*, 748 F.Supp. at 822.

### b. *Rights of Judicial Candidates*

■ Opponents of the proposed settlement argue that it infringes on the rights of potential judicial candidates. Under certain circumstances, a candidate for an open supreme court seat may find that the seat will be filled by appointment instead. Opponents maintain that this situation violates state law, which allows all qualified candidates to appear on the general election ballot. Ala.Code § 17–7–1 (Supp.1994). This argument is fallacious because candidates are only entitled to run for positions that exist. The proposed settlement temporarily removes supreme court open seats from the electoral process under some circumstances, thereby removing any right to appear on the ballot. While it may be inconvenient for candidates to find this out at a late date, such minor inconvenience is permissible to fulfill the purposes of the proposed settlement. If this situation ever occurs, candidates will still be able to seek the next available court seat.

### c. *Expanding the Size of the Courts*

■ With regard to expansion of the appellate courts, opponents of the proposed judgment argue that the legislature is vested with the authority to decide the number of judges. Although this is true, it is also the case that Alabama law places no limit on the number of appellate judges. The court has

---

**76.** Adams Aff. *in* Joint Record at 50–51; White Aff. *in* Joint Record at 610; *see also* Martin Aff. *in* Joint Record at 408. This evidence is contested, but the court finds it to be reliable.

**77.** Adams Aff. *in* Joint Record at 51; White Aff. *in* Joint Record at 610, 613–14; Martin Aff. *in* Joint Record at 644–48.

**78.** White Aff. *in* Joint Record at 610; Martin Aff. *in* Joint Record at 645. Although minority-preferred candidates do not need to be black, the court must examine all possibilities.

**79.** White Aff. *in* Joint Record at 611–15, 617, 619, 620.

**80.** *Id.* at 613–16.

**81.** Joint Record at 454; Adams Aff. *in* Joint Record at 50–51; White Aff. *in* Joint Record at 616–17.

**82.** Joint Record at 448, 454–55; White Aff. *in* Joint Record at 617.

**83.** White Aff. *in* Joint Record at 617–18; Martin Aff. *in* Joint Record at 649.

**84.** Joint Record at 454; Martin Aff. *in* Joint Record at 649.

previously approved a settlement that expanded a county commission beyond the state statutory limit, *Crenshaw County*, 748 F.Supp. at 828, and ordered a county commission expanded over its objection from four to seven members to remedy § 2 violations, *Dillard v. Baldwin County Com'n*, 694 F.Supp. 836, 843 (M.D.Ala.), *amended*, 701 F.Supp. 808 (M.D.Ala.), *aff'd*, 862 F.2d 878 (11th Cir.1988) (table). *Cf. McNeil v. Springfield Park Dist.*, 851 F.2d 937, 946 (7th Cir.1988), *cert. denied*, 490 U.S. 1031, 109 S.Ct. 1769, 104 L.Ed.2d 204 (1989) (discussing circumstances in which court could increase size of elected body); *Cousin v. McWherter*, 840 F.Supp. 1210, 1221 (E.D.Tenn.1994) (suggesting adding trial judges as remedy for § 2 violation).

In light of this precedent, it is even more evident that it is within the court's power to increase the size of appellate courts when, as is true in this case, the remedy is not only part of a settlement but has been suggested by the state itself as a *less* intrusive remedy than such conventional remedies as single-member districting. The court therefore finds that increasing the size of the courts of appeals is a reasonable means of achieving fairer representation for African–Americans. Creating seats now, rather than waiting for vacancies or open seats on smaller courts, is an appropriate remedy because blacks have waited long enough for relief. The proposed settlement increases the size of the supreme court only as a fallback measure if sufficient progress has not been made by 1998. The supreme court would then return to nine members at the next opportunity. The expansion provisions are limited and will help achieve adequate representation for African–Americans. As to the settlement intruding on the legislature's prerogative to decide whether to fund additional seats, if a court can *order* a state to bear any additional costs incident to replacing an at-large scheme with a more intrusive single-member districting

scheme, it can surely *approve* the added costs the State of Alabama asked to be placed on it as part of the less intrusive measures suggested in the proposed settlement. *See also Jenkins*, 495 U.S. at 55, 110 S.Ct. at 1665 (court can order taxes to be raised to remedy segregation).

#### d. *Governor's Appointment Power*

■ With regard to the governor's power of appointment, nothing in the state constitution says that the governor's power cannot be limited. The proposed settlement complies with the state constitution in that vacancies "shall be filled by appointment by the governor." Ala. Const. art. VI, § 6.14. Limiting the governor's choice would certainly be permissible if the legislature decided to do so.[85] To remedy past discrimination, the court can act as well.

#### 5. *Whether the Settlement's Changes to State Law are More Limited than Changes Effected by Single–Member Districts*

In assessing the changes in state law entailed by the proposed final judgment, the court is also influenced by a comparison with the changes that would be necessitated by the alternative of single-member districts. A districting system for electing appellate judges would violate the Alabama Constitution, which provides: "All judges shall be elected by vote of the electors within the territorial jurisdiction of their respective courts." Ala. Const. art. VI, § 6.13. Appellate court jurisdiction is statewide. Some of the intervenors, however, make the claim that because election is to be "within" rather than "throughout" the jurisdiction, single-member districts for appellate judges would not violate the constitution. This is a strained reading of § 6.13. Further, Alabama statutory law mandates that each of the appellate courts will be elected statewide.[86]

---

**85.** *See* Joint Record at 432–43.

**86.** Positions on the court of criminal appeals and the court of civil appeals are "filled by election from the state at large." Ala.Code §§ 12–3–2(a)–(b), 12–3–3(a) (1986). The plain language of the statute therefore compels at-large elections. The language for the supreme court is more complex.

Justices "shall be elected by the qualified electors of the state at the general elections as provided by law for the election of members of the house of representatives in congress." Ala.Code § 12–2–1 (1986). This language also suggests that at-large elections are appropriate, though there is some ambiguity. A look at legislative history,

The state further has an interest in ensuring that voters have the opportunity to vote for all appellate judges.[87] The proposed settlement upholds that interest to a greater extent than single-member districts. In deciding the appropriateness of single-member districts for appellate judges, it is useful to keep in mind the difference between legislative and judicial bodies.[88] Legislators by design represent various parts of the state. They represent constituents from certain areas rather than the state as a whole. In this context, a legislator can achieve results by making trade-offs with other legislators. Judges, however, are not engaged in the making of policy so much as interpreting the law. It would be inappropriate for judges to trade votes or base a decision on the views of a particular constituency. Even the appearance that appellate judges favored their constituency over the interests of the state as a whole would undermine the legitimacy of the judiciary. The state has an interest in maintaining that legitimacy.

B. *Whether the Settlement Violates the Voting Rights Act*

 Having determined that state law grounds do not prevent the court from approving the proposed settlement, the court now turns to two arguments under federal law. The first argument is statutory. Some of the opponents of the proposed judgment argue that appointing judges within a system that retains at-large elections is not an appropriate remedy under the Voting Rights Act. In addressing this argument, the court begins with the logical proposition that "any

proposal to remedy a Section 2 violation must itself conform with Section 2." *Crenshaw County*, 831 F.2d at 249. The court is aware that single-member districts are preferred over at-large systems. *E.g., Growe v. Emison*, — U.S. —, —, 113 S.Ct. 1075, 1084, 122 L.Ed.2d 388 (1993). However, the mere fact that districting is a remedy that has often been used in the past does not compel the court to order it this time. *See Town of Louisville*, 730 F.Supp. at 1548 ("Single-member districting plans are a common, though not exclusive, remedy in § 2 cases."). There is no authority that says the court must impose a single-member system. To the contrary, the court has previously approved settlements that did not implement single-member districting in response to at-large systems that violated § 2. *Dillard v. Town of Cuba*, 708 F.Supp. 1244 (M.D.Ala. 1988) (limited voting); *Dillard v. Chilton County Bd. of Educ.*, 699 F.Supp. 870 (M.D.Ala.1988), *aff'd*, 868 F.2d 1274 (11th Cir.1989) (table) (cumulative voting).

The court has already explained why single-member districts, as a matter of policy, are not necessarily the best remedy in this case. The court is particularly concerned that a principle preferring single-member districts that has been developed primarily in the context of rulings on election plans regarding legislative bodies not be unthinkingly transferred to the different context of appellate judges. At-large elections are only discriminatory in conjunction with other factors. For this reason, the Eleventh Circuit has noted that

---

however, removes this ambiguity. The statutory language in question is from an October 10, 1903, Alabama law regarding the supreme court. 1903 Ala.Acts 530. The previous day, the state legislature passed an act governing elections generally. That act provided that supreme court justices were among those officers who were to be elected by all of the voters of Alabama. 1903 Ala.Acts 480, § 25. The act also provides an explanation for the house of representatives language in the supreme court act. The language is not meant to suggest that districting would be appropriate for the supreme court, rather it refers to *when* elections would be held. The 1903 election act provides for a number of different election cycles depending on the position involved. 1903 Ala.Acts 480, §§ 26–31. One of those cycles is for congressional offices. The

most plausible reading of the house of representatives language is that it is referencing the supreme court elections to the timing of the congressional election cycle.

87. This interest is not necessarily determinative. In the context of appellate judges, however, the longstanding traditions of the state, seemingly not tied to improper considerations, strengthen the interest claim. The court does not hold that the mere claim of a state interest compels a result favorable to the state. The interest must be carefully examined.

88. This argument might not apply to trial judges who do not sit on a collegial body and who represent a small area. The court does not reach that issue.

"at-large procedures that are discriminatory in the context of one election scheme are not necessarily discriminatory under another scheme. The Supreme Court has repeatedly said that at-large procedures are not unconstitutional per se."

*Crenshaw County*, 831 F.2d at 250. The court has already found that the proposed settlement offers an adequate remedy. This is so notwithstanding that the basic election system remains at-large. Because districting is not a required remedy, the use of appointments as a temporary measure while retaining an at-large system does not violate § 2.

### C. *Whether the Settlement Violates the Equal Protection Clause*

The court has disposed of the argument that the proposed final judgment violates federal statutory law. It now turns to federal constitutional law. In this area, the court must address the objection that the proposed judgment is illegal because of its use of race-conscious relief. After reviewing the claims of the objectors and conducting its own independent analysis, the court concludes that the race-conscious provisions in the proposed settlement are legal.

Opponents of the proposed judgment are correct that it provides race-based relief. The judgment itself states that "the provisions are intended to serve the beneficial goal of enhancing racial diversity in the membership of [appellate] courts." In order to fulfill this goal, the proposed judgment includes two race-conscious provisions: (1) the composition of the nominating commission and (2) the triggering process for activating the nominating process. The actual appointment provisions, though geared towards selecting minority-preferred candidates, do not limit nominations to African–Americans.

Opponents of the proposed settlement contend that its race-conscious provisions violate the equal protection clause of the fourteenth amendment under *Shaw v. Reno*, — U.S. ——, 113 S.Ct. 2816, 125 L.Ed.2d 511 (1993). *Shaw* set forth a two-step inquiry for determining whether racial gerrymandering is unconstitutional. The first question is whether the fourteenth amendment is applicable. It appears that, under *Shaw*, an equal protection claim is cognizable if a redistricting plan is so irrational that, absent explanation, one would have to conclude that it was a product of racial gerrymandering. *Id.* at ——, 113 S.Ct. at 2832. If the allegations of racial gerrymandering are successfully contradicted, then there would be no fourteenth amendment violation. If not, then the court must proceed to the second step, which is to subject the plan to strict scrutiny. *Id.* at ——, 113 S.Ct. at 2830. Strict scrutiny, which is meant to prevent purposeful discrimination, requires state legislation that distinguishes among citizens on the basis of race or, though race-neutral, is unexplainable except on racial grounds to be narrowly tailored to further a compelling state interest. *Id.* at ——, 113 S.Ct. at 2825.

Prior to *Shaw*, district courts did not consider fourteenth amendment equal protection issues when approving voting rights settlements.[89] The Supreme Court, however, has left unclear the exact contours of *Shaw*. This court, therefore, begins by asking the threshold question of whether *Shaw* is limited to the redistricting context or can be extended to the appointment-based remedy in this case. Every decision applying *Shaw* of which the court is aware has done so in the context of analyzing a districting plan. The thrust of *Shaw* appears to be, however, that race-based measures are to be treated the same in voting as in other areas. *Id.* at ——, 113 S.Ct. at 2825. The court will therefore assume that the same standards apply to the appointment procedure in this case as would apply to any other settlement in a lawsuit with race-conscious measures.[90] In doing so, however, the court must remember

---

89. *See, e.g., Town of Cuba*, 708 F.Supp. 1244; *Chilton County Bd. of Educ.*, 699 F.Supp. 870; *Warren v. City of Tampa*, 693 F.Supp. 1051 (M.D.Fla.1988), *aff'd*, 893 F.2d 347 (11th Cir. 1989); *Metropolitan Pittsburgh Crusade for Voters v. City of Pittsburgh*, 686 F.Supp. 97 (W.D.Pa. 1988). *But see Harris*, 615 F.Supp. at 242–43

(foreshadowing fourteenth amendment strict scrutiny of race-based remedial measures).

90. The court applies *Shaw* out of an abundance of caution, without finding that the Supreme Court meant that decision to apply to this case. It should be noted that consciousness of race is

that legal standards developed in prior "affirmative-action" cases involving race-conscious measures, usually in the employment area, are not always wholly transferable.

Under the *Shaw* analysis, because the proposed judgment is race-based, it is subject to equal protection analysis. Therefore, the court applies strict scrutiny analysis to the proposed settlement.[91] The "purpose of strict scrutiny is to 'smoke out' illegitimate uses of race by assuring that the legislative body is pursuing a goal important enough to warrant use of a highly suspect tool." *City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493, 109 S.Ct. 706, 721, 102 L.Ed.2d 854 (1989) (plurality opinion). It "also ensures that the means chosen 'fit' this compelling goal so closely that there is little or no possibility that the motive for the classification was illegitimate racial prejudice or stereotype." *Id.* Strict scrutiny requires that racial classifications "be narrowly tailored to further a compelling governmental interest." *Shaw,* —— U.S. at ——, 113 S.Ct. at 2825. The court first turns to the compelling state interest prong of the inquiry.

1. *Compelling State Interest*
 a. *Defining the Interests*

■ The court examines two interests in this case that potentially justify race-based measures.[92] The first is remedying past and present discrimination. The second is complying with § 2 of the Voting Rights Act.[93] Affirmative action jurisprudence makes clear that a state has a compelling interest in remedying its past and present discrimination. *E.g., United States v. Paradise*, 480 U.S. 149, 167, 107 S.Ct. 1053, 1064, 94 L.Ed.2d 203 (1987) (plurality opinion); *Ensley Branch, NAACP v. Seibels*, 31 F.3d 1548, 1564-65 (11th Cir.1994); *Peightal v. Metropolitan Dade County*, 26 F.3d 1545, 1552 (11th Cir.1994).

■ The court also concludes that compliance with the Voting Rights Act is a compelling state interest.[94] The best way of understanding why this is so is to reflect on the purposes of the Voting Rights Act. The Act was passed precisely to remedy government-sponsored discrimination in voting. *Katzenbach*, 383 U.S. at 308-09, 86 S.Ct. at 808. When Alabama attempts to comply with the Act it does so to remedy past and present discrimination, which is a compelling interest. In addition, there is a legal basis rooted in "affirmative-action" jurisprudence for the conclusion that compliance with the Voting Rights Act is a compelling state interest. The Supreme Court has declared that

at the heart of the Voting Rights Act. There is a distinction between awareness of race and racial discrimination. *See Shaw,* —— U.S. at ——, 113 S.Ct. at 2826; *id.* at ——, 113 S.Ct. at 2834–36 (White, J., dissenting); *id.* at ——, 113 S.Ct. at 2846–47 (Souter, J., dissenting). Districting inherently involves the awareness of race and the Voting Rights Act compels that localities and states be aware of the racial impact of legislation. This awareness of race does not cause anyone to lose the right to vote; in contrast, the problem with racial discrimination in the employment context is that a white person could be denied a job. Nonetheless, the opinion in *Shaw* holds that "affirmative-action" jurisprudence is applicable to at least some measures taken under the Voting Rights Act. *See infra* Part V.C.2.a. The ramifications of this opinion on the Act are still unclear. *See Miller*, 864 F.Supp. at 1373.

**91.** It is possible that the court should apply an intermediate level of review rather than strict scrutiny. Among other arguments, the primary reason why intermediate scrutiny might be appropriate is that the state has entered into the settlement in order to comply with the Voting

Rights Act, a congressional mandate. The Supreme Court has applied intermediate scrutiny to minority preference policies implemented pursuant to a mandate by Congress. *Metro Broadcasting, Inc. v. F.C.C.*, 497 U.S. 547, 563–65, 110 S.Ct. 2997, 3008–09, 111 L.Ed.2d 445 (1990). The court does not decide the question of whether strict or intermediate scrutiny is the correct legal standard, but uses strict scrutiny because it is the more stringent standard.

**92.** The court has previously identified other interests that support the settlement such as avoiding election delays and maintaining statewide appellate judicial elections. The court does not address whether these are compelling enough to justify affirmative action.

**93.** To the extent that the state has a compelling interest in complying with § 2, the interest reaches the full Voting Rights Act, including § 5. Here, the court focuses on § 2.

**94.** A three-judge district court recently reached the same conclusion. *Shaw v. Hunt*, 861 F.Supp. 408, 436–37 (E.D.N.C.1994) (three-judge court).

states "have a very strong interest in complying with federal antidiscrimination laws that are constitutionally valid as interpreted and as applied." *Shaw*, —— U.S. at ——, 113 S.Ct. at 2830. The Voting Rights Act has not been held unconstitutional and complying with it remains a strong state interest. More generally, the Court has said that a statutory violation can be a basis for a governmental body's determination that remedial measures are necessary. *Croson*, 488 U.S. at 500, 109 S.Ct. at 725 (majority opinion). Thus, in determining whether there has been prior discrimination by a public employer that justifies remedial action, courts have looked to whether the evidence supports a prima facie case of employment discrimination under Title VII. *Id.* at 501, 109 S.Ct. at 725–26; *Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 292, 106 S.Ct. 1842, 1856, 90 L.Ed.2d 260 (1986) (O'Connor, J., concurring); *Peightal*, 26 F.3d at 1553. Similarly, lack of compliance with the Voting Rights Act would serve as strong evidence for remedial measures.

b. *Defining the Evidentiary Standard*

In determining whether a state actor has engaged in racial discrimination sufficient to justify remedial measures based on race, the court must conduct an evidentiary inquiry. *E.g., Peightal*, 26 F.3d at 1553. The governmental body must have a " 'strong basis in evidence for its conclusion that remedial action was necessary.' " *Croson*, 488 U.S. at 500, 109 S.Ct. at 725 (majority opinion) (quoting *Wygant*, 476 U.S. at 277, 106 S.Ct. at 1849 (plurality opinion)).[95] The test can also be formulated as requiring "a prima facie case of a constitutional or statutory violation." *Croson*, 488 U.S. at 500, 109 S.Ct. at 725 (majority opinion).[96] In assessing the strength of the evidence, the court is aware that it cannot depend on societal discrimination alone. *Id.* at 500, 109 S.Ct. at 725.

Race-conscious relief is justifiable only if discrimination is identified with some specificity in the governmental unit to which the relief is to apply. *Id.* at 504, 109 S.Ct. at 727; *Peightal*, 26 F.3d at 1553.

In examining whether the state has a compelling interest to justify the proposed judgment, the court focuses on evidence that the state was not complying with § 2. The state's interest in remedying past discrimination and in avoiding a § 2 violation can both be established through the same evidentiary showing because a violation of § 2 is necessarily an instance of specific past discrimination.[97] The court, therefore, must conduct a § 2 liability inquiry. In doing so, the court makes use of types of evidence approved in past "affirmative-action" cases. Employment cases make clear that statistical evidence of a disparity between minorities hired by a public employer and qualified minorities is evidence that is properly used to justify race-based remedial measures. *E.g., Croson*, 488 U.S. at 501–02, 109 S.Ct. at 725–26 (majority opinion); *Seibels*, 31 F.3d at 1565. Anecdotal evidence is also relevant. *Seibels*, 31 F.3d at 1565. Finally, even though "evidence of historical discrimination by the defendants may not be sufficient by itself to justify race-conscious relief, it is fully appropriate to consider such historical evidence, especially where the historical discrimination has yet to be remedied." *Shuford*, 846 F.Supp. at 1522. Thus, the court will look to statistical, anecdotal, and historical evidence in conducting its § 2 inquiry to determine whether a strong basis in evidence for implementing remedial measures is present.

Section 2 liability need not actually be proven to justify the proposed settlement:

"Although *Croson* requires that a public employer show strong evidence of discrimination when defending an affirmative ac-

---

**95.** This test has been used recently by the Eleventh Circuit. *Seibels*, 31 F.3d at 1565; *Peightal*, 26 F.3d at 1553.

**96.** It has been argued that under the second formulation evidence need only "approach" a prima facie case. *Peightal*, 26 F.3d at 1553. The court does not believe that is the correct reading of the statement that there was "nothing ap-

proaching a prima facie case of a constitutional or statutory violation." *Croson*, 488 U.S. at 500, 109 S.Ct. at 725 (majority opinion). *See Shuford*, 846 F.Supp. at 1521 & n. 21 (discussing prima facie case formulation).

**97.** *See Hunt*, 861 F.Supp. at 443–44.

tion plan, the Supreme Court has never required that, before implementing affirmative action, the employer must have already proved that it has discriminated. On the contrary, formal findings of discrimination need neither precede nor accompany the adoption of affirmative action."

*Seibels,* 31 F.3d at 1565 (citing cases). Thus, the state need not admit § 2 liability nor does there have to be a judicial finding of a § 2 violation prior to the state entering into an affirmative action settlement. *Howard v. McLucas,* 871 F.2d 1000, 1007–08 (11th Cir.) (employment discrimination), *cert. denied,* 493 U.S. 1002, 110 S.Ct. 560, 107 L.Ed.2d 555 (1989). Instead, the court must now decide whether there is a strong basis in evidence for concluding that there is a prima facie § 2 violation in the Alabama appellate judicial electoral system.

### c. *Examining § 2 Liability*

Section 2 of the Voting Rights Act is violated if the "totality of the circumstances" reveal that citizens of a particular race "have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C.A. § 1973 (West 1994).[98] In order to determine whether official action has racially discriminatory results, courts must decide whether "a certain electoral law, practice, or structure interacts with social and historical conditions to cause an inequality in the opportunities enjoyed by black and white voters to elect their preferred representatives." *Thornburg v. Gingles,* 478 U.S. 30, 47, 106 S.Ct. 2752, 2764, 92 L.Ed.2d 25 (1986). In order to show that such an inequality exists in a case challenging a multi-member system, "a bloc voting majority must *usually* be able to defeat candidates supported by a politically cohesive, geographically insular minority group." *Id.* at 49, 106 S.Ct. at 2765–66. There are three threshold

requirements to making out this proof: first, that a minority group is " 'sufficiently large and geographically compact to constitute a majority in a single-member district'; second, 'that it is politically cohesive'; and third, 'that the white majority votes sufficiently as a bloc to enable it ... usually to defeat the minority's preferred candidate.' " *Emison,* — U.S. at ——, 113 S.Ct. at 1084 (quoting *Gingles,* 478 U.S. at 50–51, 106 S.Ct. at 2766–67).

A recent Supreme Court case makes clear that, though the three *Gingles* requirements are necessary to establishing vote dilution, they are not always sufficient. *Johnson v. De Grandy,* — U.S. ——, ——, 114 S.Ct. 2647, 2657, 129 L.Ed.2d 775 (1994). Instead, the court must take into account other relevant facts in examining the totality of the circumstances, including opportunities for the minority group to participate in the political process. *Id.* at ——, 114 S.Ct. at 2657. The court will, therefore, proceed by examining the three *Gingles* requirements before turning to other factors that are relevant to showing that the totality of the circumstances provide a strong basis of evidence to conclude vote dilution occurred in this case.

### i. *Threshold Requirements*

Because the courts of criminal and civil appeals consist of five members each and the supreme court is made up of nine members, the first prong of the *Gingles* test requires the court to ask whether blacks could constitute a geographically compact majority in a single-member district of a five-district plan and in a single-member district of a nine-district plan.[99] The court finds, based on the expert report of Jerry Wilson, that there is a strong basis in evidence to conclude that African–Americans are sufficiently numerous and geographically compact to form a majority in at least one single-member district in a

---

**98.** State judicial elections are covered by § 2. *Chisom,* 501 U.S. at 404, 111 S.Ct. at 2368.

**99.** Admittedly, the current size of the appellate courts is a product of possibly unprecleared legislative acts. Section 2 liability is, however, based on the existing structure of the electoral system and its effect on minority voters. *See*

*Gingles,* 478 U.S. at 47, 50 n. 17, 106 S.Ct. at 2764, 2766 n. 17. Therefore, the court need not determine the potential for majority-black districts if the unprecleared acts were invalidated leaving a three-member court of appeals and a seven-member supreme court.

five- or nine-member district plan.[100] Wilson sets forth two five-member districting plans that each allow for one district with a black voting age population of over 50%.[101] Wilson also details two nine-member districting plans that each provide for two districts with a majority black voting age population.[102] Based on this evidence, the plaintiffs have met the numerosity requirement. Further, at least one of each of the five- and nine-member districting plans has districts that meet the requirement of geographic compactness, which this court has described as ensuring effective representation. *Dillard v. Baldwin County Bd. of Educ.*, 686 F.Supp. 1459, 1466 (M.D.Ala.1988); *see also* Pamela S. Karlan, *Maps and Misreadings: The Role of Geographic Compactness in Racial Vote Dilution Litigation*, 24 Harv.C.R.–C.L.L.Rev. 173, 210–212 (1989) (approving of functional approach to compactness). None of the plans looks anything like the plan found objectionable in *Shaw*. Because there exist a five-member and a nine-member districting plan in which blacks could constitute a geographically compact majority in at least one district, there is a strong basis in evidence to conclude that the first *Gingles* requirement is satisfied.

The court also finds that there is a strong basis in evidence that blacks in Alabama are politically cohesive, meeting the second prong of the *Gingles* test. Political cohesion must be shown because without it the challenged electoral structure is not necessarily impeding minority interests. *Gingles*, 478 U.S. at 51, 106 S.Ct. at 2766. One way of showing the necessary political cohesion is by analyzing voting patterns to see if members of a minority group generally vote for the same candidates. *Id.* at 56, 106 S.Ct. at 2769. Candidates of choice of a minority group need not be minorities themselves. *See, e.g., Carrollton Branch of NAACP v. Stallings*, 829 F.2d 1547, 1557 (11th Cir. 1987), *cert. denied*, 485 U.S. 936, 108 S.Ct. 1111, 99 L.Ed.2d 272 (1988). The expert report of Gordon Henderson, which analyzes Alabama elections from 1982 to 1992, provides ample evidence of black political cohesiveness.[103] Henderson conducted a bivariate regression analysis to compare a precinct's black and white voting age populations and the votes a candidate received.[104] This regression produces an estimate of what percent of each racial group voted for a candidate. It also produces a measure of the consistency of the relationship across precincts—the r-squared value. Bivariate regression analysis has been approved for use in voting cases. *E.g., id.* at 1558. Nonexpert testimony is also acceptable. *Id.*

**100.** The Department of Justice has reached the same conclusion. Letter from Assistant Attorney General Deval L. Patrick to Alabama Attorney General Jimmy Evans, dated April 14, 1994 (file document no. 65), at 6. Wilson's report is based to a large extent on districts drawn by Representative Curry. Joint Record at 467–586.

**101.** Joint Record at 84–93. The Supreme Court has left undecided whether courts should examine total minority population or voting age minority population in determining numerosity. *Emison*, — U.S. at — n. 4, 113 S.Ct. at 1083 n. 4. The court does not need to decide this question because either alternative meets the majority requirement for every plan.

**102.** Joint Record at 120–28. Wilson also analyzes five seven-member districting plans, each of which allows for one or two districts with a majority black voting age population. Joint Record at 94–119. There is no seven-member appellate court in Alabama at present. A recent decision of the Supreme Court compels the conclusion that, in a § 2 challenge to at-large or multi-member districts, liability must be based on a determination that, if the same number of offi-

cials were elected from single-member districts as were elected at-large, there could be at least one minority district with a majority population. *Holder v. Hall*, — U.S. —, —, 114 S.Ct. 2581, 2585–86, 129 L.Ed.2d 687 (1994) (plurality opinion); *id.* at —, 114 S.Ct. at 2590 (O'Connor, J., concurring). This court therefore bases its analysis of the first prong of *Gingles* solely on possible five- and nine-member single-district plans.

However, because *Holder* dealt with liability and not potential remedies, the seven-member districts would be relevant in assessing remedies.

**103.** Joint Record at 163–380.

**104.** Henderson also conducted a homogenous precinct analysis, in which predominantly minority precincts are compared with predominantly white precincts to see if they support different candidates. Henderson counted a precinct as homogenous if more than 90% of its registered voters were of one race. Joint Record at 170. While there is not as much data available for this analysis, the results that are available tend to corroborate the bivariate regression analysis.

Based on his analysis of 143 elections, Henderson concluded that

> "there can be no doubt that African–Americans were extraordinarily cohesive behind their candidates of choice. In 132 of these 143 contests, better than 80 percent of African–Americans voted for the candidate of their choice. And in 98 of these contests, the percent of African–Americans voting for the candidate of their choice was greater than 95." [105]

These numbers are comparable to those the Supreme Court has found to establish black political cohesiveness. *Gingles,* 478 U.S. at 59, 106 S.Ct. at 2770. Further, the pattern extends over time, which substantiates the result. *Id.* at 57, 106 S.Ct. at 2769–70. Henderson's evidence is consistent with prior court decisions finding black political cohesiveness in Alabama. *Dillard v. Crenshaw County,* 649 F.Supp. 289, 295 (M.D.Ala.1986) (Calhoun, Lawrence, and Pickens Counties), *remanded,* 831 F.2d 246 (11th Cir.1987), *reaff'd on remand,* 679 F.Supp. 1546 (M.D.Ala.1988); *United States v. Dallas County Com'n,* 636 F.Supp. 704 (S.D.Ala. 1986) (Dallas County); *Hale County v. United States,* 496 F.Supp. 1206, 1213 (D.D.C. 1980) (Hale County).

It is true that only one judicial race, the run off between Justice Adams and Jim Ziegler in 1982, is represented in Henderson's survey. A number of factors, however, persuade the court that political cohesiveness extends to judicial elections. First, in eight of the ten counties analyzed in the Adams race, more than 80% of blacks voted for Justice Adams, the black candidate.[106] The one statewide judicial race for which data is before the court, therefore, provides evidence of black cohesiveness. Second, the Justice Department has made findings corroborating

this data. "Elections at all levels in the state generally are characterized by racially polarized voting. We have repeatedly found this to be the case in past Section 5 reviews, most recently on a statewide basis [in 1992]." [107] The Justice Department further found "that polarized voting extends to judicial elections." [108] Based on Henderson's study, prior cases, and the findings of the Justice Department, the court finds that there is a strong basis in evidence that the second prong of *Gingles* is satisfied.

The court now turns to the third *Gingles* prong: whether there exists white bloc voting sufficient to usually defeat the preferred candidate of African–Americans. Legally significant white bloc voting occurs when the white bloc vote normally defeats minority votes and white "crossover" votes. *Gingles,* 478 U.S. at 56, 106 S.Ct. at 2769. *Gingles* makes clear that there is no cutoff point after which white bloc voting can be said to defeat a minority-preferred candidate; rather, that figure will vary depending on local conditions. *Id.* at 56, 106 S.Ct. at 2769.

Like black political cohesiveness, courts have previously found white bloc voting in various sections of Alabama. *Crenshaw County,* 649 F.Supp. at 295 (Calhoun, Lawrence, and Pickens Counties); *Dallas County Com'n,* 636 F.Supp. 704 (Dallas County); *Brown v. Bd. of School Comm'rs of Mobile County,* 542 F.Supp. 1078, 1091, 1105 (S.D.Ala.1982) (Mobile County), *aff'd,* 706 F.2d 1103 (11th Cir.), *aff'd mem.,* 464 U.S. 1005, 104 S.Ct. 520, 78 L.Ed.2d 705 (1983); *Bolden v. City of Mobile,* 542 F.Supp. 1050, 1076 (S.D.Ala.1982) (Mobile County); *Hale County,* 496 F.Supp. at 1213 (Hale County). Additionally, the Justice Department's finding that racially polarized voting is present at

---

**105.** Joint Record at 188. The 143 elections are actually 142 separate county election returns and one congressional district election return from 1982 to 1992. The 143 returns cover a number of different elections, but do not include all counties for all elections. The races analyzed are one for associate justice in 1982, one for governor in 1986, one for U.S. senator in 1986, five for local office in Baldwin County in 1986, one for president in 1988, one for president in 1992, and four for Congress in 1992.

**106.** Although the r-squared values for the ten counties range from 0.01 to 0.82, Henderson provides a convincing explanation of this lack of consistency based on the racial makeup of the precincts within the counties. Joint Record at 180–81.

**107.** Letter from Assistant Attorney General Deval L. Patrick to Alabama Attorney General Jimmy Evans, dated April 14, 1994 (file document no. 65), at 5.

**108.** *Id.*

all levels of elections in Alabama, including judicial elections, indicates that white bloc voting is present.

The court also relies on statistical evidence. Henderson's survey makes clear that whites, though cohesive, are not as cohesive as blacks. This should not be surprising. The percentage of whites voting for minority-preferred candidates ranges from 0.94% to 68%. Only 17 of the 143 returns show more than 50% of whites voting for minority-preferred candidates.[109] The lack of racially polarized voting in a few elections does not automatically lead to the conclusion that there is no legally significant bloc voting. *Gingles,* 478 U.S. at 57, 106 S.Ct. at 2770. The overwhelming pattern in Alabama is that whites vote against the minority-preferred candidate.[110] The one judicial race presents stark evidence of the pattern. The percentage of whites voting for Justice Adams ranged from 30% to 46%.[111] In *Gingles,* white bloc voting was found when white support for black candidates ranged from 8% to 50%. *Id.* at 59, 106 S.Ct. at 2771. Although this evidence in *Gingles* shows that whites were sometimes more unified than in the Adams race, the important point is that the majority of whites voted for the white candidate in each of the ten counties in the Adams race.

The third prong of *Gingles,* however, requires more than white bloc voting. It also requires that such voting usually defeat the preferred candidate of minorities. Of course, "the success of a minority candidate in a particular election does not necessarily prove that the district did not experience polarized voting in that election; special circumstances, such as the absence of an opponent, incumbency, or the utilization of bullet voting, may explain minority electoral success in a polarized contest." *Id.* at 57, 106 S.Ct. at 2770; *see also id.* at 75, 106 S.Ct. at 2779. These special circumstances are not meant to be exclusive. *Id.* at 57 n. 26, 106 S.Ct. at 2770 n. 26. The Henderson survey presents a number of instances in which the minority-preferred candidate won. Some of these are likely explainable through special circumstances like those mentioned in *Gingles.* For instance, Justice Adams probably achieved a good number of white votes because of his status as an incumbent. United States Representative Earl Hilliard, a black candidate, won in a majority-black district.

Were this case to proceed to a trial, it is unclear whether the plaintiffs would be able to prove the third *Gingles* prong. It is not the court's duty, however, to determine § 2 liability with finality at this stage. The court must determine only that there is a strong basis in evidence for the state to conclude that liability would be found. The court bases its decision that this burden has been met as to the third *Gingles* requirement on the following: First, though the data presented by Henderson is incomplete and has not been analyzed for many of the special circumstances that would explain the success of minority-preferred candidates, there is reason to believe that a more complete statistical picture would enhance the plaintiffs' case. This is suggested by the Justice Department's findings as well as the work of another expert in *Southern Christian Leadership Conference of Alabama v. Evans,* 785 F.Supp. 1469, 1474 (M.D.Ala.1992), *judgment vacated,* 18 F.3d 897 (11th Cir.), *vacated and reh'g en banc granted,* 18 F.3d 897 (11th Cir.1994).

Second, the evidence before the court suggests that because of the difficulty of running for appellate judge as a black nonincumbent, qualified blacks do not seek election.[112] Prior to 1994, no African–American had run for the court of criminal or civil appeals.[113] The only black to run statewide for an appellate judgeship was Justice Adams, an appointee,

---

**109.** Joint Record at 189–236.

**110.** The 17 returns in which a majority of whites voted for the minority-preferred candidate come from only five of the 14 races analyzed and from only 12 different counties. There are likely good explanations for these aberrations.

**111.** Joint Record at 190–92.

**112.** Adams Aff. *in* Joint Record at 57–58; Gray Aff. *in* Joint Record at 66; Reed Aff. *in* Joint Record at 36.

**113.** Stipulation 98 *in* Joint Record at 21.

who was elected in 1982 and 1988.[114] Potential judicial candidates who would be the most likely first choices of the black community are not running. The fact that few blacks have been candidates for statewide office in general and the appellate courts in particular should not prevent a § 2 violation from being shown. *Gingles,* 478 U.S. at 57 n. 25, 106 S.Ct. at 2769 n. 25; *see also Stallings,* 829 F.2d at 1556–59 (finding racially polarized voting on basis of four elections, only one of which was for challenged office). The reason qualified blacks are reluctant to run statewide judicial campaigns is racial discrimination. For instance, Justice Adams won his 1982 run off by a narrow margin, notwithstanding that he had the advantage of incumbency, experience, and funds over his white opponent.[115] To allow the existence of discrimination to prevent a § 2 liability showing, would defeat the goals of the Voting Rights Act. *See Westwego Citizens for Better Gov't v. City of Westwego,* 872 F.2d 1201, 1209 n. 9 (5th Cir.1989); *see also Nipper v. Smith,* 1 F.3d 1171, 1179 (11th Cir.1993), *vacated and reh'g en banc granted,* 17 F.3d 1352 (11th Cir.1994).

Third, there is a larger question presented about what the definition is of a minority-preferred candidate. If this is simply defined as any candidate who draws a majority of the black vote, there is no question but that these candidates are not being totally shut out of office. This is an impoverished definition, however, because it neglects to ask whether blacks have the ability to vote into office a candidate whom they actually desire, not one whom they simply prefer over an alternative. *See Campos v. City of Baytown,* 840 F.2d 1240, 1245 (5th Cir.1988) (disagreeing with argument that "any time a candidate gets a majority of the minority votes he is the 'chosen representative' of the minority group"), *cert. denied,* 492 U.S. 905, 109 S.Ct. 3213, 106 L.Ed.2d 564 (1989).[116] A similar conclusion is virtually compelled in the context of multiple-seat elections. In this situation, where voters can vote for more than one candidate, victorious candidates who receive more than 50% of the black vote are not the true candidates of choice of the African–American community if defeated candidates received an even greater percentage of the black vote. *Collins v. City of Norfolk,* 883 F.2d 1232, 1237–40 (4th Cir. 1989), *cert. denied,* 498 U.S. 938, 111 S.Ct. 340, 112 L.Ed.2d 305 (1990). Although appellate judicial races in Alabama are conducted by numbered posts, a candidate who receives the majority of the black vote is still not necessarily the true candidate of choice of the African–American community. For instance, blacks might have preferred a different candidate in the primary or a black candidate might have chosen not to run because of the small chance of winning. The court realizes it is treading on dangerous ground by attempting to ascertain who is really the black community's candidate of choice. Yet it is important to introduce a measure of subjectivity into the statistical analysis to understand what it is that is being measured. Under the current statistical techniques, the minority-preferred candidate is simply the candidate whom blacks prefer the most of those running. Because many potential black candidates are choosing not to run or losing in primaries, the statistical evidence does not present a full picture of the extent to which white bloc voting is preventing minority-preferred candidates from electoral success.

Based on prior case law, findings of the Justice Department, statistical analysis, and anecdotal evidence, the court finds that a strong basis in evidence exists to substantiate the third prong of *Gingles.*

### ii. *Totality of the Circumstances*

The court has found a strong basis in evidence that the three *Gingles* prerequisites have been satisfied and now turns to other factors that relate to showing that the totali-

---

**114.** Stipulation 95 *in* Joint Record at 21.

**115.** Adams Aff. *in* Joint Record at 50–51; Gray Aff. *in* Joint Record at 64–65.

**116.** Mayor Arrington notes the "typical political reality in which candidates tapped by the white community compete for black votes among themselves." Arrington Aff. *in* Joint Record at 45. "In that scenario," he explains, "no candidate tapped by the white community can properly be called the candidate of choice of the black community." *Id.*

ty of the circumstances indicate that blacks have less opportunity than whites to participate in the political process and to elect candidates of choice of the African–American community. The Supreme Court has held that, in assessing the totality of the circumstances, courts may consider a number of factors listed in the Senate Judiciary Committee Report on the Voting Rights Act. *Gingles,* 478 U.S. at 48, 106 S.Ct. at 2765.[117] The court may also examine other relevant factors. *Id.* at 45, 106 S.Ct. at 2763. The court, based on the presence of a number of the Senate Report factors, finds that a strong basis in evidence exists to conclude that the totality of the circumstances show a § 2 violation. In particular, the court finds that: (1) African–Americans in Alabama have experienced discrimination by the state in all areas of their lives, notably in employment and education; (2) this discrimination has extended to the area of voting; (3) such voting discrimination has included state practices and procedures discriminating against blacks; (4) elections involving black candidates have further been characterized by racial appeals; and (5) the result of this discrimination has been that blacks find it difficult to achieve statewide office.

The court begins by noting the abundant evidence showing that blacks in Alabama have suffered from the state's discrimination in all aspects of their lives. *Crenshaw County,* 640 F.Supp. at 1359–60 (detailing findings of societal discrimination). The court here summarizes only that evidence relating to past and present discrimination in education and employment, two areas which can affect the ability of blacks to participate in the political process. Discrimination in education has been and continues to be present in Alabama. *E.g., Lee v. Macon County Bd. of Educ.,* 231 F.Supp. 743, 750–51 (M.D.Ala. 1964) (three-judge court) (per curiam) (state policy of segregation in elementary and secondary schools); *Knight v. State of Alabama,* 14 F.3d 1534, 1538–39 (11th Cir.1994) (state operated racially separate system of higher education until 1960's and has not eliminated vestiges of dual system). To cite one example that is particularly pertinent to this case, until the 1960's, the University of Alabama School of Law, the only state supported law school in Alabama, refused to admit black applicants. It was only in 1964 that the first black student enrolled.[118] Alabama also has a history of discrimination in state employment. *E.g., United States v. Frazer,* 317 F.Supp. 1079 (M.D.Ala.1970) (state agencies discriminated against blacks in employment); *Paradise v. Prescott,* 585 F.Supp. 72 (M.D.Ala.1983), *aff'd,* 767 F.2d 1514 (11th Cir.1985), *aff'd,* 480 U.S. 149, 107 S.Ct. 1053, 94 L.Ed.2d 203 (1987) (racially discriminatory practices in employing state troopers); *Shuford,* 846 F.Supp. at 1522–28 (past and

---

**117.** The Senate Report lists seven typical factors courts should consider in determining whether a § 2 violation exists:

"1. the extent of any history of official discrimination in the state or political subdivision that touched the right of the members of the minority group to register, to vote, or otherwise to participate in the democratic process;
2. the extent to which voting in the elections of the state or political subdivision is racially polarized;
3. the extent to which the state or political subdivision has used unusually large election districts, majority vote requirements, anti-single shot provisions, or other voting practices or procedures that may enhance the opportunity for discrimination against the minority group;
4. if there is a candidate slating process, whether the members of the minority group have been denied access to that process;
5. the extent to which members of the minority group in the state or political subdivision bear the effects of discrimination in such areas as education, employment and health, which hinder their ability to participate effectively in the political process;
6. whether political campaigns have been characterized by overt or subtle racial appeals;
7. the extent to which members of the minority group have been elected to public office in the jurisdiction."
S.Rep. No. 417, 97th Cong., 2d Sess., *reprinted in* 1982 U.S.C.C.A.N. 177, 206–07 (footnotes omitted).
The report then adds two additional factors that may be probative:
"[8.] whether there is a significant lack of responsiveness on the part of elected officials to the particularized needs of the members of the minority group.
[9.] whether the policy underlying the state or political subdivision's use of such voting qualification, prerequisite to voting, or standard, practice or procedure is tenuous."
*Id.* at 207 (footnotes omitted).

**118.** Stipulation 25 *in* Joint Record at 6.

present discrimination in postsecondary educational system). This discrimination has acted to hinder the ability of blacks to participate in the political process. *Baldwin County Bd. of Educ.,* 686 F.Supp. at 1467.

The court now turns to the history of official discrimination in the state directly regarding voting that has hindered the ability of blacks to participate in the democratic process. Alabama's history of voting discrimination is legion. A comprehensive description of this discrimination is detailed in *Crenshaw County,* 640 F.Supp. at 1356–59. Rather than repeat that discussion, the court here focuses on a few important examples. In 1893, the Alabama legislature passed an election statute known as the Sayre Law. "The express purpose of the law, according to its author, was to legally eliminate the Negro from politics in Alabama." *Bolden,* 542 F.Supp. at 1062. The law apparently caused black voter turnout to drop 22% between 1892 and 1894. *Id.* Then, at the turn of the century, Alabama's "Constitutional Convention of 1901 was part of a movement that swept the post-Reconstruction South to disenfranchise blacks." *Hunter v. Underwood,* 471 U.S. 222, 229, 105 S.Ct. 1916, 1920, 85 L.Ed.2d 222 (1985). The resulting constitution managed to eliminate from the voting rolls all but 4,000 of the 181,000 African–Americans of voting age. *Bolden,* 542 F.Supp. at 1063 & n. 10. In the 1950's, in response to the Supreme Court's ban on white primaries, the Alabama legislature passed a bill banning single-shot voting in at-large municipal elections. *Crenshaw County,* 640 F.Supp. at 1356. This bill was meant to weaken black voting strength by abolishing a tool minorities can use to concentrate voting strength behind a few candidates. *Id.* In the 1960's, the state legislature required that all state, county, and municipal at-large elections be held using numbered places in order to reduce black voting strength. *Id.* at 1357. Alabama has a majority-vote requirement in primaries. Ala.Code § 17–16–36 (Supp.

1994). The combination of numbered posts and a majority vote requirement can hinder minority political participation. *See Baldwin County Bd. of Educ.,* 686 F.Supp. at 1467; *Crenshaw County,* 649 F.Supp. at 295. The legislature also attempted to dilute black voting strength through racial gerrymandering. *Gomillion v. Lightfoot,* 364 U.S. 339, 81 S.Ct. 125, 5 L.Ed.2d 110 (1960); *Sims v. Baggett,* 247 F.Supp. 96, 108–09 (M.D.Ala.1965) (three-judge court) (per curiam). This racial discrimination has hindered African–Americans from participating in electing judges.[119]

Further, appointments to the Alabama courts at all levels have historically been overwhelmingly white.[120] A review of the record in this case reflects that of the 26 appointees to appellate courts since 1968, only two have been black.[121]

The historical evidence compellingly shows that official voting discrimination in Alabama has acted to impede the ability of blacks to participate in the democratic process. It also shows that the state has used voting practices and procedures meant to discriminate against the African–American community. In particular, blacks have been unable to fully participate in selecting appellate judges.

The court further finds that political campaigns in Alabama have been characterized by racial appeals. For example, in the 1982 Democratic primary for associate justice, Justice Adams' white opponent ran an ad featuring pictures of himself and Justice Adams. *Evans,* 785 F.Supp. at 1473. The court also notes that, although not in the record, the 1994 Democratic primary for state auditor was characterized by the same type of racial appeal.[122]

The sum of this racial discrimination has resulted in only one black person achieving statewide election. Justice Adams managed to achieve this feat with the advantage of incumbency. As recently as the 1994 primary, the black candidate Johnny Ford was

**119.** *See* Report of Robert J. Norrell *in* Joint Record at 133–58.

**120.** Letter from Donald V. Watkins to Steven H. Rosenbaum of April 4, 1994, *in* Joint Record at 416; stipulations 82–87 *in* Joint Record at 19–20.

**121.** Joint Record at 447–50. Justice Cook's appointment is not included in the record, but is one of the 26 noted by the court.

**122.** Defendants' brief filed July 13, 1994, at 32 n. 22.

unable to obtain the Democratic nomination for state auditor. Not only are blacks being defeated for statewide office, but they are choosing not to even run because of the difficulty of success without the help of incumbency. The court finds that there has been little African–American success in statewide races.

The court concludes based on the evidence summarized above, that there is a strong basis in evidence that under the totality of the circumstances the current appellate judicial election system violates § 2. This conclusion is based particularly on the interaction of an at-large election system, including a majority-vote requirement in primaries and numbered posts, with racially polarized voting patterns. These factors have likely diluted the black vote, a situation which is exacerbated by past and present discrimination in voting and other areas. The state has a compelling interest in remedying this situation.

As discussed earlier, § 2 liability necessarily implies past and present discrimination in voting. However, aside from any strong basis in evidence of a specific § 2 violation—that is, evidence that satisfies the demanding requirements of the Voting Rights Act—there is still a strong basis in evidence of past and present voting discrimination by the state. The findings detailed above go beyond general societal discrimination. They present a strong basis in evidence that blacks have been and continue to be discriminated against in Alabama statewide elections, particularly statewide judicial elections. Therefore, regardless of whether a § 2 violation exists, the state has a strong basis in evidence to conclude that it must remedy past and present discrimination in voting.

### 2. Narrowly Tailored

The court now examines whether the race-conscious relief in the proposed settlement is narrowly tailored to achieving the state's interests in complying with § 2 and remedying past and present discrimination. The court follows the Supreme Court and the Eleventh Circuit in determining that there are four factors that must be analyzed to decide whether a remedy is narrowly tailored: "the necessity for the relief and the efficacy of alternative remedies; the flexibility and duration of the relief, including the availability of waiver provisions; the relationship of the numerical goals to the relevant labor market; and the impact of the relief on the rights of third parties." *Paradise*, 480 U.S. at 171, 107 S.Ct. at 1066; *accord Seibels*, 31 F.3d at 1568–69; *Peightal*, 26 F.3d at 1557; *In re Birmingham Reverse Discrimination Employment Litig.*, 20 F.3d 1525, 1545 (11th Cir.1994).

 The Supreme Court has further recognized that deciding whether relief is appropriate to remedying racial discrimination is necessarily a balancing process left to the discretion of the district court within certain limits. *Paradise*, 480 U.S. at 184, 107 S.Ct. at 1073. *See also Fullilove v. Klutznick*, 448 U.S. 448, 508, 100 S.Ct. 2758, 2790, 65 L.Ed.2d 902 (1980) (opinion of Powell, J., concurring). This suggests that narrow tailoring is a *range* of what is acceptable, not one perfect plan. For this reason, the definition of narrowly tailored does not depend on the views of one judge. If it did, parties would be forced to find a solution that represents the ideal of the court before which litigation is occurring. This situation would create an impossible dilemma for parties on appeal and in future litigation. Different courts will always have different opinions on what is the most narrowly tailored option.[123] The important consideration is not whether the type of race-conscious relief fashioned by the parties is the best, an inherently subjective determination, but whether it comes within a range of acceptable solutions, a much more objective test. Few judges will

---

**123.** Justice White recognized exactly this problem in the voting rights context:

"Is it more 'narrowly tailored' to create an irregular majority-minority district as opposed to one that is compact but harms other State interests such as incumbency protection or the representation of rural interests? Of the following two options—creation of two minority influence districts or of a single majority-minority district—is one 'narrowly tailored' and the other not?"

*Shaw*, —— U.S. at ——, 113 S.Ct. at 2842 (White, J., dissenting).

agree on what plan's details are best, but many will agree on whether a plan is acceptable. With this is mind, the court examines the four factors necessary to determine whether the proposed final judgment is narrowly tailored.

### a. *Necessity and Alternative Remedies*

■ Based on the strong evidence of a § 2 violation and past and present discrimination, it was necessary for the state to find some remedy. The court begins by looking at whether the state considered race-neutral remedies before deciding on the proposed settlement. *Croson,* 488 U.S. at 507, 109 S.Ct. at 729 (majority opinion); *see also Seibels,* 31 F.3d at 1571 (exhaustion of every alternative not necessary, but must be serious examination of race-neutral measures).

In the area of voting, race-neutral measures are few and far between. The primary race-neutral measure considered in this case is cumulative voting. In a cumulative voting system, all candidates stand for election at the same time. Voters are allowed multiple votes, which they can distribute among the candidates. This system allows African-Americans to cast all of their votes for one candidate, thereby enhancing the opportunity to elect a minority-preferred candidate. *See Chilton County Bd. of Educ.,* 699 F.Supp. at 872, 874–75 (describing cumulative voting system). There is no evidence in the record that cumulative voting would be effective. To the contrary, the evidence suggests that cumulative voting would not be a good method of electing appellate judges. Justice Adams opposed cumulative voting for the following reasons: (1) because it would probably entail having all judges up for reelection at the same time, which would endanger continuity; (2) because it would pit judges against each other, which could harm their collegiality; (3) because it would give fringe groups more power; and (4) because it might not work to remedy discrimination.[124] The court also notes that cumulative voting would require changes in state law. Ala.Code § 17–16–21 (1987) (requiring numbered places); Ala.Code § 17–16–36 (Supp.1994) (requiring majority vote in primaries). Al-though the court would not rule out imposing a cumulative voting remedy, there appear to be no serious advocates for it and no evidence that it would work.

■ The primary alternative to the proposed judgment is to implement a single-member district system for electing appellate judges. This solution, however, is not race-neutral. In order to comply with the Voting Rights Act and remedy discrimination, the state would have to take race into account in drawing the district lines. The districting remedy, therefore, is race-conscious. *De Grandy,* —— U.S. at ——, 114 S.Ct. at 2661. The question remains whether it is the type of race-consciousness that the Supreme Court was trying to reach in establishing the strict scrutiny standard in *Shaw.* The Court expressly left open whether the mere act of creating majority-black districts gives rise to an equal protection claim. *Shaw,* —— U.S. at ——, 113 S.Ct. at 2828. Some courts examining reapportionment legislation have already moved beyond the *Shaw* context of strangely shaped districts. *See Vera v. Richards,* 861 F.Supp. 1304, 1331–36 (S.D.Tex. 1994) (three-judge court); *Hays v. State of Louisiana,* 839 F.Supp. 1188, 1195 (W.D.La. 1993) (three-judge court), *vacated,* —— U.S. ——, 114 S.Ct. 2731, 129 L.Ed.2d 853 *aff'd on remand,* 862 F.Supp. 119 (W.D.La.1994). Whether these decisions are correct interpretations of *Shaw* or not, the Supreme Court is clear that a plaintiff can state a cause of action by alleging that districting "legislation, though race-neutral on its face, rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race, and that the separation lacks sufficient justification." *Shaw,* —— U.S. at ——, 113 S.Ct. at 2828. Districting for the purpose of remedying a § 2 violation by its nature almost has to be an effort to separate voters by race. The point is not that § 2 relief is always or even often unconstitutional, but that it is likely subject to equal protection analysis under the approach taken in *Shaw. See id.* at ——, 113 S.Ct. at 2824. It is true that mere awareness of race is not the same as racial

---

**124.** Adams Aff. *in* Joint Record at 55–57; *see* *also* Martin Aff. *in* Joint Record at 407–08.

discrimination.[125] Even if a remedy is not racially discriminatory, however, it still is not race-neutral if it takes race into account. *But see DeWitt v. Wilson*, 856 F.Supp. 1409, 1415 (E.D.Cal.1994) (three-judge court) (strict scrutiny not required when race considered in conjunction with traditional redistricting principles), *petition for cert. filed*, 63 U.S.L.W. 3127 (U.S. Aug. 8, 1994) (No. 94–275). For this reason, districting remedies are race-conscious.[126]

Although the parties rejected pure race-neutral relief, it is important that race-neutral provisions are included in the proposed judgment. *Shuford*, 846 F.Supp. at 1528–29. All eligible attorneys, not just African–Americans, can be appointed under the proposed settlement. This represents a change from the original proposed judgment, which provided that only blacks would be eligible for appointment. The current settlement attempts to find black-preferred judges, who are not necessarily African–American. The evolution of the judgment shows that the parties were striving to make the remedy as narrowly tailored as possible. In addition, the proposed judgment contemplates that after up to six appointments there will be no more race-conscious relief. The boost of incumbency in the short run combined with potential long run decrease in white bloc voting for all elections through familiarity with blacks in office should allow for a real solution to voting problems, rather than forever having separate black and white districts. *Cf. Seibels*, 31 F.3d at 1572 (refusing to approve consent decree where "Board may indefinitely administer racially discriminatory tests and then attempt to cure the resulting injury to blacks with race-conscious affirmative action"). The court finds that the parties considered pure race-neutral means and correctly concluded that race-conscious relief was necessary, but still used race-neutral measures when possible. Under these circumstances, race-based relief is necessary and permissible.

125. *See supra* note 90 (discussing distinction).

126. The court addresses below whether districting is more narrowly tailored than the relief in the proposed judgment.

#### b. *Flexibility and Duration of Relief*

■ The court finds that the proposed settlement is both temporary and flexible. Race-conscious relief must be limited in duration so that it ends when discrimination is remedied. *Seibels*, 31 F.3d at 1570–71; *Peightal*, 26 F.3d at 1558. The proposed settlement is limited to 24 years unless extended by the court. The parties have made an effort to narrowly tailor the proposed judgment by modifying the original proposal, which was of unlimited duration. Nevertheless, 24 years is still a long time. However, this is not an employment discrimination case where racially discriminatory practices are more easily rectified. Here, for the judgment to be fully successful, changes must take place in voting behavior. The Voting Rights Act has been law for almost 30 years and there is still voting along racial lines in the state. Further, as explained earlier, during the last two to three decades, whites have enjoyed an overwhelming advantage in judicial appointments, while blacks have been denied the opportunity to elect candidates of their choice. The record reflects that of the 26 appointees to appellate courts since 1968, only two have been black.[127] Twenty-four years is therefore a reasonable period of time to allow for shifts in voting behavior, without artificially engineering a racial balance forever. Additionally, the state is allowed to petition to terminate the judgment. It is even possible that after the four initial appointments to the court of appeals and one or two appointments to the supreme court, the nominating commission will never have to choose nominees again. Further, any appointed judge will still be required to stand for election; thus the appointment is not permanent. Finally, the possibility of an extension does not cause the court to treat the appointment procedure as permanent. *Shuford*, 846 F.Supp. at 1529.

■ The court now turns to the flexibility of the relief. In the employment context, flexibility forbids the rigid use of quotas, but allows the use of hiring goals. *Seibels*, 31

127. Joint Record at 447–50. Justice Cook's appointment is not included in the record, but is one of the 26 noted by the court.

F.3d at 1576; *Peightal,* 26 F.3d at 1558–59; *Shuford,* 846 F.Supp. at 1529. Rigid quotas allow for appointment without examination of relative qualifications in order to obtain a certain number of blacks in the workforce. *Seibels,* 31 F.3d at 1576. A typical improper quota would require that blacks be represented in the workforce in the same proportion as they are represented in the local population. *See Croson,* 488 U.S. at 507–08, 109 S.Ct. at 729 (majority opinion). Such a quota system is to be contrasted to goals, which "eschew making the color of an applicant's skin the sole relevant consideration and thus are less problematic from an equal protection standpoint." *Peightal,* 26 F.3d at 1558. The court uses this standard to first examine the way in which race is used in selecting the judges themselves and then to look at the use of race in composing the nominating commission.

 The flexibility requirement for an appointment remedy in the voting rights area is similar to that in the employment context. The remedy should avoid requiring that a certain number of blacks be appointed. Rather, it should allow for individual consideration of each applicant. The proposed judgment meets the flexibility requirement. It only allows appointments of attorneys qualified under state law to take the bench. There is no racial quota or limitation on appellate judges. *Cf. Brooks,* 848 F.Supp. at 1572–77 (refusing to approve settlement setting minimum requirement for number of black judges). The commission can nominate, and the governor can appoint, attorneys of any race.

The proposed settlement does set up a system analogous to flexible hiring goals. The first two appointments to each of the courts of appeals are required. These appointments are flexible, however, because the appointees do not have to be black—they need only be qualified, and they are subject to eventual election. After these initial appointments, any further appointments to the courts of appeals and all appointments to the supreme court will occur if there are fewer than two members of a court who are black or who were appointed through the nominating process. Thus, racial composition of the

courts is part of the triggering formula for the nominating process. Racial composition, however, is not the determining factor in this triggering formula. Indeed, because the initial appointees to the courts of appeals could be white, any future appointments to those courts do not have to be triggered even if there are no black judges on the courts of appeals. Because there are no initial appointments to the supreme court, its racial composition does become the de facto guide at first. The court finds the use of racial composition of the courts to be permissible because there is no requirement that the appointee actually be black; instead, the appointee must be qualified, and the appointee is subject to election.

Further, the court notes that the triggering formula is more narrowly tailored than the original settlement, which provided that appointments would be triggered if two blacks were not on each appellate court. The court also notes that the original settlement provided that the first white supreme court justice who vacated office would be replaced by a black regardless of who was on the court. This provision has been eliminated in the current proposal, creating a more narrowly tailored remedy. Additionally, if two blacks are elected to the supreme court before the first seat is to be filled by appointment, the proposed judgment will not implement the appointment procedure.

The use of race in the triggering formula is actually a way of further narrowly tailoring the judgment rather than guaranteeing blacks judgeships. The proposed judgment allows for the possibility that blacks will run and be elected to the appellate courts independent of the nominating process. If there is a black candidate elected in the usual manner, this should serve to curtail appointments because it is an indication that the procedure is unnecessary. By providing that the number of blacks on the appellate courts is to be factored in together with the members of the courts who were appointed through the nominating process, the proposed settlement ensures that there will not be unnecessary appointments made. This is a hallmark of flexibility.

The court also notes two further changes that were made to make the proposed final judgment as narrowly tailored as possible. The original proposal provided that if the number of associate justices is increased, a seat on the supreme court would be abolished if it was vacated by a white justice. The current proposal requires that the seat be abolished if the vacating justice is white or if the seat was not filled by the judicial nominating commission. Additionally, the original settlement provided for discussions about further remedial measures if there were fewer than two African–Americans on any of the appellate courts for more than a year after 2003. The current proposal triggers this provision only if there are fewer than two judges or justices who are black or who were appointed through the nominating process. These two amendments make the judgment more narrowly tailored because they do not focus solely on race in implementing the judgment. Like the triggering mechanism, these provisions are flexible. Further, they cause little if any harm.

The court now turns to the flexibility of the race-based provisions regarding the composition of the nominating commission. The proposed settlement provides that the nominating commission be composed of one member selected by the Alabama Lawyers Association; one member selected by the Alabama State Bar Association; two members selected from the plaintiff class by class counsel; and one member selected by majority vote of the other four members or, in the event of deadlock, by the Black Legislative Caucus. The court is less concerned with these requirements because, as will be discussed, the composition of the commission has little prejudicial effect on whites. *See Shuford,* 846 F.Supp. at 1529 n. 33, 1531. Even here, however, the court finds flexibility.

The court begins by looking at the purpose of the judicial nominating commission, which is to serve as a proxy for black voters in selecting minority-preferred candidates. It cannot be denied that blacks are particularly well-suited to fulfilling this function. Thus, two slots on the five-member commission are set aside for blacks.[128] The other three slots can be filled by either blacks or whites. The parties have modified the proposed judgment along the lines suggested by the Boehm class of white electors and the Alabama State Bar so that rather than the three additional members of the commission being chosen *by and from* the selecting organizations, the added members will be chosen only *by* those organizations.[129] Thus, after the two seats reserved for blacks, there is no fixed quota for the remainder of the seats. A minimum of 40% black membership on a commission charged with finding minority-preferred candidates to rectify discrimination is appropriately narrowly tailored. *See id.* at 1516 (approving committee for recommending college job applicants with minimum 40% African–American composition). The commission is merely an intermediary between voters and appointees. The members of the commission themselves gain no benefit from any race-conscious provisions.

Because there is no quota for the number of black judges, the race-based measures are suitably flexible, and the provisions are all temporary, the court concludes that the proposed settlement meets the requirement that it be flexible and limited in duration.

### c. *Over– and Under–Inclusiveness*

The court now examines what has been stated in the employment context as "the relationship of the numerical goals to the relevant labor market." *Peightal,* 26 F.3d at 1558. Thus, hiring goals must be "reasonably related to the pool of qualified minorities." *Seibels,* 31 F.3d at 1576. This requirement is meant to ensure that race-conscious relief does not go beyond correcting for discrimination. Because the judges ap-

---

128. The idea of courts ordering that blacks sit on committees is nothing new. Joint Record at 626–42 (discussing bi-racial committees in school desegregation cases). Appointment by plaintiffs' counsel also has precedent. *Id.* at 634.

129. According to Charlotte Coleman, the Executive Secretary of the Alabama Lawyers Association, that group, while predominantly black, is open to whites as well. Coleman Aff. *in* Joint Record at 622–24. The Black Legislative Caucus is by definition a black organization. The Alabama State Bar Association is predominantly white.

pointed can be either black or white, it is unclear that the court even needs to make an inquiry into over- and under-inclusiveness. However, out of an excess of caution, the court does make that inquiry.

■ Because this is a voting rights case, the parties and intervenors have suggested two possible definitions of the relevant pool: the number of black voters or the number of qualified black attorneys. Were this an employment case, the relevant labor market would be black attorneys because the question would be how black jobseekers have been discriminated against. In a voting case, however, where the purpose is to remedy violations of § 2 and past and present discrimination in voting, the question is different. The court is not concerned with how the percentage of black judges compares to the percentage of black attorneys, but how many black-preferred judges there would be if there was no voting discrimination.

The primary reason why the number of minority lawyers is not the appropriate guide to whether representation is adequate is because "the Voting Rights Act is not about equal employment opportunities; it is about equal opportunity of *voters* to participate in the political process and elect representatives of their choice." *League of United Latin American Citizens,* 999 F.2d at 913, n. 14 (King, J., dissenting). Section 2 is concerned with the political opportunities of "members of the electorate." 42 U.S.C.A. § 1973(b) (West 1994). The Act was not passed to protect the rights of candidates. *But see Brooks,* 848 F.Supp. at 1575 (number of black lawyers relevant population for equal protection analysis); *League of United Latin American Citizens,* 999 F.2d at 865–66 (eligible minority candidates for judgeships relevant to § 2 determination).

Even if candidates were the relevant group, the pool would have to be expanded beyond black attorneys. The voting inquiry focuses on minority-preferred candidates not just black candidates. The pool of attorneys who would be minority-preferred candidates is significantly larger than just black attorneys. Put another way, in the employment context, hiring a white person whom black people supported would not remedy discrimi-

nation; in the voting rights context, electoral success by a white candidate preferred by blacks can remedy discrimination. This is particularly true under the proposed settlement because the judges appointed can be either black or white.

■ In deciding the correct benchmark, the court notes that blacks comprise approximately 25% of the population of Alabama and 23% of the voting age population. For the purposes of this inquiry, the court chooses the more conservative figure of 23% for the relevant pool. In affirmative action terms, this means that absent voting discrimination it would be expected that around 23% of judges would be minority-preferred candidates. The proposed settlement contemplates relief reaching two seats on each of the seven-member appeals courts or 28% of the seats and two seats on the nine-member supreme court or 22% of the seats. The court finds that the number of judgeships reached by the proposed settlement as a percentage of the seats on each appellate court is comparable to the black percentage of the voting age population in Alabama.

To the extent that the court must examine the appropriateness of the requirement that the nominating commission have two black members, it also assumes the relevant qualified population to be 23%. Blacks must comprise 40% of the commission. There is nothing wrong with this disparity, however. In the employment context, courts are permitted to approve "affirmative-action" goals that are twice the proportion of qualified minorities. *Seibels,* 31 F.3d at 1576–77; *Cone Corp. v. Hillsborough County,* 908 F.2d 908, 916–17 (11th Cir.), *cert. denied,* 498 U.S. 983, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990). Where the goal is merely for a nominating commission like that in this case, there is even less reason to be suspect of the minor over-inclusiveness.

The court is satisfied that the proposed judgment's numerical goals regarding judicial appointees and the nominating commission are narrowly tailored to the qualified minority population.

#### d. *Impact on Third Parties*

 The court now turns to the effect of the race-conscious provisions in the proposed settlement on third parties. The court must find that there is not an unacceptable or undue burden on innocent third parties. *Paradise,* 480 U.S. at 182, 107 S.Ct. at 1072; *Seibels,* 31 F.3d at 1576; *Peightal,* 26 F.3d at 1561. The court looks first at the race-conscious provisions regarding the composition of the nominating commission. This commission is similar to the selection committee approved in *Shuford.* There the court recognized that a 40% black composition requirement had "virtually no prejudicial effect on the rights of [whites]." *Shuford,* 846 F.Supp. at 1529 n. 33. The purpose of the committee was to ensure blacks were *considered* for employment. *Id.* at 1531. Similarly, the nominating commission exists solely to identify minority-preferred candidates. There is no benefit to serving on the commission similar to the benefit accorded by obtaining a job. The membership of the commission is designed to give blacks significant input into judgeships that they have previously been hindered in electing because of discrimination. While it is true that whites are harmed in the sense that they have less of a chance to affect the nominating decision, the whole point of the commission is to find candidates preferred by blacks. Thus, the question of whether whites are unduly harmed by the proposed judgment does not depend on the composition of the nominating commission, but on the appointments themselves. It is this question that the court now examines, beginning with the harm to candidates and concluding with the harm to voters.

White candidates are still eligible for every appellate judgeship. They can apply to the nominating commission for any seat for which there will be a remedial appointment, run for these seats after the appointed term ends, and stand for election for the vast majority of seats not touched by the proposed settlement. Further, because the settlement adds as many seats to the courts of appeals as will be appointed, the number of seats on those courts up for election will remain the same. In sum, white candidates for judgeships will have many opportunities to seek and obtain judgeships; moreover, the proposed settlement does not displace any incumbent justice or judge. *See Wygant,* 476 U.S. at 283, 106 S.Ct. at 1852 (comparing "foreclosing only one of several opportunities" with imposing "entire burden of achieving racial equality on particular individuals"); *cf. In re Birmingham Reverse Discrimination Employment Litig.,* 20 F.3d at 1549 (adverse impact of limited promotion opportunities for whites). The proposed settlement imposes the sort of diffuse burden the Eleventh Circuit has upheld. *See Peightal,* 26 F.3d at 1561–62; *Howard,* 871 F.2d at 1009–10. It is true that under some circumstances, candidates for associate justice may have declared for a seat that is subsequently set aside for appointment. It must be kept in mind, however, that this circumstance may never occur. Even if it does arise, the potential candidate can simply run for the next available seat with little harm done.[130]

Finally, the court turns to the effect of the appointment provisions on white voters. Although some seats that would otherwise be subject to election would be subject under the proposed judgment to appointment by a commission at least 40% black, the court does not conclude that this is an undue burden. State law already provides for appointment in some situations. Even assuming that all the appointments are black judges who are not the candidates of choice of whites, the appointees will eventually have to stand for election. The worst that can be said of the proposed settlement's effect on white voters is that there will be some delay in voting for, at most, two of the judges on each of the three appellate courts. Meanwhile, whites will dominate the electorate for all of the other judges. White voters are asked to bear a diffuse burden that does not unduly harm their rights. The court concludes that neither white voters nor white candidates are unacceptably burdened by the race-conscious provisions of the proposed judgment.

It should also not be forgotten that without the proposed settlement, there will probably

---

**130.** For further discussion of this point, see *supra* Part V.A.4.b.

be appellate judges whose terms will have expired but who, because of the § 5 challenge in this litigation, still will not have to stand for election before white voters.

### e. The Alternative of Single–Member Districting

The proposed settlement's race-based relief meets each of the four prongs of the narrow-tailoring test. For this reason the court finds the proposed judgment acceptable under strict scrutiny. Because single-member districting has been proposed as a remedy, however, the court will conduct a brief examination of that alternative.[131] Based on this examination, the court concludes that, although single-member districting could very well be narrowly tailored, it is not substantially more so than the appointment remedy.

Single-member districting is, like the appointment remedy, flexible. It creates majority-black districts but does not guarantee that blacks will be elected. *See Shaw v. Hunt,* 861 F.Supp. 408, 446–47 (E.D.N.C. 1994) (three-judge court). A move to single-member districts, however, has no set ending date. In fact, moving from single-member districts to at-large elections would have to be justified under § 5 of the Voting Rights Act. *See Beer v. United States,* 425 U.S. 130, 141–42, 96 S.Ct. 1357, 1364, 47 L.Ed.2d 629 (1976). It should be noted that the districts themselves can be redrawn if race becomes less of an issue.[132] *Hunt,* 861 F.Supp. at 447–48. A districting remedy could be narrowly tailored to the relevant pool of minority voters by creating black districts in proportion to the black voting age population. *Id.* at 448. Finally, the effects of a district-

ing remedy on white voters would be greater than those of the proposed judgment.[133] In districting, whites are allowed to vote only for one candidate rather than all. Under the proposed settlement, whites will have their current right to vote for all the justices and judges only minimally curtailed. Districting would seriously affect that right.[134]

In sum, the districting remedy has a longer duration and greater impact on white voters than the appointment remedy. Because narrow tailoring is a range, however, it could be that the districting remedy would still be permissible. The court need not decide that question because the parties have reached an agreement to implement the appointment remedy. If that remedy meets the requirements the court has set out in this opinion, it does not have to be the best possible solution. Based on the preliminary analysis conducted above, the court reaches the conclusion that the single-member districting remedy is not so narrowly tailored as to raise questions about why it was not the remedy on which the parties settled or to require that it be implemented.

The important question here is not whether a districting remedy *could be* narrowly tailored but whether the appointment remedy *is* narrowly tailored. The court finds that the proposed remedy is sufficiently narrowly tailored to meet a compelling state interest and therefore does not violate the equal protection clause.

### VI. CONCLUSION

In summary, the proposed final judgment provides a real and substantial opportunity for the black citizens of this state to partici-

---

**131.** This examination is not meant to replace the thorough inquiry that might have to take place under *Shaw* if a particular districting plan was before the court. It is meant merely to illustrate that districting plans in the generic sense are not substantially more narrowly tailored than the appointment plan.

**132.** In the context of appellate judicial races where statewide elections are important, redrawing of districts to be less race-conscious does not address all of the consequences of the permanent nature of districting. For example, the interest in having appellate judges representing the whole state would not be satisfied. In, for instance, a county commission, the court might

ascribe less weight to the permanence of a districting remedy because commissioners are meant to represent constituencies.

**133.** There also exists a potentially greater impact on incumbent white judges who might be forced to run against each other in a districting system.

**134.** Once again, this consequence is most problematic in the context of appellate judges, who rule on matters affecting the state as a whole. In the context of a legislative body, the decrease in electoral opportunities would probably be less problematic.

pate in the political process on an equal basis with all other citizens and elect candidates of their choice to appellate judgeships. It is thus fair, adequate, and reasonable. In addition, the changes it makes in state law are limited and necessary; it does not violate § 2 of the Voting Rights Act; and its race-conscious provisions are narrowly tailored to meet a compelling state interest. Moreover, the judgment will serve two very important and substantial interests: first, it will preserve the state's at large system of electing appellate judges; and, second, it will allow the 1994 elections and future elections for all existing appellate judgeships to proceed, furthering both the state's interest in minimizing disruption and the public's interest in voting for judges. For all of these compelling reasons, the court concludes that it should approve the proposed judgment.

Finally, the court is mindful of the prophetic comments of Judge Richard T. Rives almost 30 years ago:

> "I look forward to the day when the State and its political subdivisions will again take up their mantle of responsibility ... and thereby relieve the federal Government of the necessity of intervening in their affairs."

*Dent v. Duncan,* 360 F.2d 333, 337–38 (5th Cir.1966) (Rives, J., concurring). This federal court will not stand in the way of the State of Alabama's commendable effort to take up that mantle.

Accordingly, for the above reasons, it is the ORDER, JUDGMENT, and DECREE of the court:

(1) That all objections to the revised proposed final judgment are overruled; and

(2) That the revised proposed final judgment, filed by the plaintiffs and the defendants on September 15, 1994, is approved.

It is further ORDERED that defendants State of Alabama and Secretary of State James Bennett shall notify the court and all other parties forthwith of any decision regarding preclearance, pursuant to § 5 of the Voting Rights Act of 1965, as amended, 42 U.S.C.A. § 1973c (West 1994).

## FINAL JUDGMENT

On January 27, 1994, plaintiffs Hoover White, John A. Dillard, and Glenn Moody, filed this class action lawsuit alleging *inter alia* that Alabama's at-large election system for electing its appellate court judges violates the plaintiffs' rights under Section 2 of the Voting Rights Act of 1965, as amended, 42 U.S.C. § 1971 *et seq.,* and the Fourteenth and Fifteenth Amendments to the United States Constitution. The complaint also alleged that Acts of Alabama No. 987 (1969), creating the Alabama Court of Civil Appeals and the Alabama Court of Criminal Appeals; Acts of Alabama No. 75 (1971), increasing the number of Alabama Court of Criminal Appeals judges from three to five; and Acts of Alabama No. 93–346 (1993), increasing the number of Alabama Court of Civil Appeals judges from three to five, not having been precleared by the Attorney General of the United States pursuant to § 5 of the Voting Rights Act, are null, void, and legally unenforceable.

Plaintiffs seek declaratory judgment declaring that Acts No. 987, 75, and 93–346 are null, void, and legally unenforceable; plaintiffs also seek injunctive relief against the enforcement of those Acts. Plaintiffs sought appropriate relief on their claims under § 2 of the Voting Rights Act as well as the Fourteenth and Fifteenth Amendments and 42 U.S.C. § 1983.

On February 14, 1994, plaintiffs moved to amend their complaint to add an allegation that Alabama Act No. 602 (1969), which increased the number of Alabama Supreme Court Justices from seven to nine, had not been precleared by the Attorney General of the United States as required by § 5 of the Voting Rights Act, and therefore was void and legally unenforceable. The amended complaint seeks declaratory judgment and injunctive relief enjoining the defendants from enforcing the provisions of Act No. 602 (1969). On February 16, 1994, the Court granted plaintiffs' motion.

Defendants have filed an answer to the complaint, as amended, which, *inter alia,* denies the material allegations of the complaint. Defendants further deny that Alabama Acts Nos. 602, 987, and 75 were not

previously precleared by the Attorney General of the United States. Defendants admit, however, that Act No. 93–346 is presently before the Attorney General of the United States for preclearance review, with a decision due by no later than April 14, 1994. Defendants deny that Act No. 93–346 is presently being enforced. Defendants deny that the plaintiffs are entitled to a Three–Judge District Court in this action.

The defendants do not contest the appropriateness of the class. The defendants do not contest the definition of the class as described in the Hoover White, et al., plaintiffs' complaint, as amended.[1]

The named plaintiffs and the class they represent, and the defendants, admit that no black person has ever been elected to the Alabama Courts of Civil or Criminal Appeals. They also admit that, prior to the 1994 election cycle, no black person has ever sought election to such courts. They also admit that the only black person ever elected to the Alabama Supreme Court was elected twice, following his initial gubernatorial appointment to the Supreme Court in 1980. The parties also admit that no state election law or political party rule prevents black attorneys from qualifying as candidates for election to any of the appellate court seats. The parties further admit that two black attorneys have already announced their candidacies for judgeships in the scheduled 1994 elections for appellate court judges. One of the two black attorneys is running for the Alabama Supreme Court. The second black attorney is running for the Alabama Court of Criminal Appeals.[2]

The named plaintiffs, and the class that they represent, and the defendants, are desirous of implementing a solution to the subject matter of this action in a manner that assures compliance with the Voting Rights Act of 1965, the United States Constitution, and the *Constitution of Alabama* (1901), provides substantial relief to the plaintiffs, promotes the orderly administration of the 1994 electoral process for appellate court judgeships without fostering voter confusion, and saves taxpayers the tremendous monetary expense of litigation. The parties have waived further hearings in this matter, except for an appropriate hearing under Fed. R.Civ.P. 23(e), and have agreed on the form of this judgment. This agreement has been achieved without admissions by the defendants of violations of the United States Constitution or any federal statute. The Court is of the opinion that the entry of this judgment will effectuate the mandates of the U.S. Constitution and federal law. Therefore,

It is ORDERED, ADJUDGED, and DECREED that:

1. The State of Alabama shall conduct its regularly scheduled 1994 primary, run-off and general elections for the state's appellate court judgeships, including the Supreme Court of Alabama, in accordance with the State's existing laws (including Acts Nos. 602, 987, 75 and 93–346) for at-large elections. The court is mindful of the fact that the Attorney General of the United States has initiated a Section 5 review of the State's at-large election system for electing judges to the Courts of Criminal and Civil Appeals, which said review is pending at this time. In the event the Attorney General interposes an objection to the at-large system for these appellate courts, the named plaintiffs, as class representatives, specifically waive any claim to preliminary injunctive relief against said elections pending (a) a Section 5 review and preclearance by the Attorney General of the United States of the State's at-large election system, as amended and modified by this judgment; or (b) the State's exhaustion of its judicial remedies, pursuant to 42 U.S.C. § 1973c, for reviewing the Attorney General's objection (if any) in the United States District Court for the District of Columbia. The parties agree that the judges elected in

1. The defendants stipulated that the Hoover White, et al., plaintiffs have satisfied all prerequisites to class certification, as claimed in the complaint as amended. The parties agreed that any additional class certification issues would be determined at the Rule 23(e) fairness hearing. The Court is satisfied that the Hoover White, et al., plaintiffs adequately represent the class, and that the class meets all prerequisites to certification under Fed.R.Civ.P. 23.

2. The past and present effects of racial discrimination and current electoral conditions are reflected in the stipulations attached hereto.

the 1994 elections shall serve full six-year terms.

2. In the event that the Attorney General of the United States preclears Act No. 93–346 at any time prior to the 1994 scheduled elections, the additional judgeships created by said Act shall be part of the 1994 primary, run-off, and general elections. In the event the Attorney General of the United States does not preclear Act No. 93–346, the named plaintiffs, as class representatives, specifically waive any claim to preliminary injunctive relief against said elections pending (a) a Section 5 review and preclearance by the Attorney General of the United States of the State's at-large election system, as amended and modified by this judgment; or (b) the State's exhaustion of its judicial remedies, pursuant to 42 U.S.C. § 1973c, for reviewing the Attorney General's objection (if any) in the United States District Court for the District of Columbia. The parties agree that the judges elected to these two judgeships in the 1994 elections shall serve full six-year terms.

3. Without a waiver of the defendants' contention that Act No. 602 has been precleared, the State of Alabama has submitted Act No. 602 to the Attorney General of the United States for preclearance. In the event the Attorney General of the United States interposes an objection to Act No. 602, the named plaintiffs, as class representatives, specifically waive any claim to preliminary injunctive relief against said elections pending (a) a Section 5 review and preclearance by the Attorney General of the United States of the State's at-large election system, as amended and modified by this judgment; or (b) the State's exhaustion of its judicial remedies, pursuant to 42 U.S.C. § 1973c, for reviewing the Attorney General's objection (if any) in the United States District Court for the District of Columbia. In the event the Attorney General preclears Act No. 602 in the context of the proposed judgment, the parties agree that the judge elected to this judgeship in the 1994 elections shall serve a full six-year term.

3. This total of seven judgeships per court includes the two additional seats on the Alabama

4. The goal of the remedial provisions set forth in this judgment is to serve the compelling state interest in remedying the past and present effects of racial discrimination and current electoral conditions, which inhibit members of the plaintiff class in electing candidates of their choice to the appellate courts of the State of Alabama. The provisions are intended as a flexible means of providing class members a meaningful and equal opportunity to elect candidates of their choice to judgeships on the Alabama Courts of Civil and Criminal Appeals and the Alabama Supreme Court. In addition, the provisions are intended to serve the beneficial goal of enhancing racial diversity in the membership of those courts.

5. (a) On or before December 31, 1996, the State of Alabama shall create two additional at-large judgeships for the Courts of Criminal and Civil Appeals, for a total of seven judgeships for each court,[3] and shall provide adequate funding for said judgeships and staff. Accordingly, the Governor of the State of Alabama shall make an appointment to each of the judgeships provided for in this decree pursuant to the procedures set forth below. The appointees shall be selected from a list of three nominees per judgeship. Said list of nominees shall be developed as follows:

(i) Any attorney, who possesses the qualifications required by Alabama law for holding the judgeships created herein and who wishes to be considered as a nominee, must provide to the Administrative Director of Courts, 300 Dexter Avenue, Montgomery, Alabama 36130 (telephone: 205–242–0300), written notice of his or her wishes to be considered and evaluated as a nominee on or before June 15, 1996. Upon receipt of said notice(s), the Administrative Director of Courts shall forthwith provide a copy of each written notice to counsel for the plaintiffs' class and the Attorney General of the State of Alabama. The Administrative Director of Courts shall, by July 1, 1996, forward all such notices to the judicial nominating commission established in paragraph 4(a)(ii) below.

Court of Civil Appeals created by Act No. 93–346.

(ii) This order hereby establishes a judicial nominating commission whose purpose shall be to screen and evaluate the persons who have requested consideration as potential nominees, and to prepare the final list of nominees for each judgeship for submission to the Governor. The Administrative Director of Courts shall provide secretarial and support services and meeting facilities for the nominating commission.

(iii) The nominating commission shall consist of five members, selected as follows: two members selected by and from the plaintiff class to be designated by class counsel; one member selected by the Alabama Lawyers Association; one member selected by the Alabama State Bar Association; and one member selected by majority vote of the other four members of the nominating commission. In the event that these four members are unable to agree as to the selection of the fifth member, then the fifth member shall be selected by the Black Legislative Caucus of the legislature of the State of Alabama. In the event of any vacancy on the commission, the vacancy shall be filled by the same entity, person or process which selected the person whose absence created the vacancy.

(iv) No member of the nominating commission shall seek or accept appointment to any of the judgeships created by this order.

The final lists of nominees for each judgeship shall be submitted by the nominating commission to the Governor, and to the Chief Justice of the Alabama Supreme Court, on or before November 1, 1996, with copies to be provided contemporaneously to the plaintiffs' class counsel and the Attorney General of Alabama. The Governor shall choose, for each judgeship, an appointee from the respective lists submitted to him under this procedure not later than December 1, 1996. The appointments to the newly created

judgeships shall be for a term as provided by Section 6.15(a) of Amendment No. 328 to the *Constitution of Alabama* (1901), as amended. Thereafter, subject to the provisions of paragraph 5(b) below, these judgeships shall be subject to statewide election.

(b) After the initial appointment of judges as provided in paragraph 5(a), in the event that a vacancy occurs on either the Court of Civil Appeals or the Court of Criminal Appeals and there are fewer than two sitting members of such Court who either are members of the plaintiff class or who were appointed pursuant to the judicial nominating commission procedure created by this judgment, then the Governor shall make an appointment to that vacancy pursuant to the general procedures outlined in paragraph 5(a) of this Judgment. Such appointee shall serve a term of office as provided in § 6.14 of Amendment No. 328 of the *Constitution of Alabama*.

6. (a) The Chief Justice and the eight Associate Justices of the Supreme Court of Alabama shall continue to be elected under the election laws of the State of Alabama.

(b) In the event that one or more vacancies occurs after January 17, 1995, and there are fewer than two sitting Associate Justices on the Supreme Court of Alabama who either are members of the plaintiff class or who were appointed pursuant to the judicial nominating commission procedure created by this judgment, then the Governor shall make an appointment or appointments pursuant to the general procedures outlined in paragraph 5(a) of this Judgment, such that two Associate Justices shall be members of the plaintiff class or appointed through the judicial nominating commission procedure created by this judgment.[4] Such appointee shall serve a term of office as provided in § 6.14 of Amendment No. 328 of the *Constitution of Alabama*.

(c) Notwithstanding the provisions of paragraphs 6(a) and (b) above, if on January 1, 1996, there are fewer than two sitting

**4.** The Court recognizes that the time-line for the nominating commission's acceptance, screening and evaluation of applications will vary depending on the circumstances of each vacancy. As such, definitive time-lines cannot be enumerated in this Court Order for each vacancy referred to in this paragraph or elsewhere in this Judgment.

However, in case of any vacancy (except as described in paragraph 6(e)), the commission shall submit a list of nominees to the Governor not later than thirty days after the vacancy occurs; and the Governor shall appoint a nominee from the list within thirty days after the list is submitted to the Governor.

Associate Justices on the Supreme Court of Alabama who either are members of the plaintiff class or who were appointed pursuant to the judicial nominating commission procedure created by this judgment, then the State, as a temporary remedy, shall first determine whether every incumbent Associate Justice whose seat is up for reelection in the 1996 primary, run-off, and general election cycle has qualified under the laws of Alabama to seek reelection for that position. If an Associate Justice does not qualify for any reason by the qualifying deadline for primary elections, then that Justice's position shall become a remedial seat and shall be filled under the procedures set out in paragraph 5(a) above, to serve a term as provided under § 6.15 of Amendment No. 328 to the *Constitution of Alabama*, such term to begin on January 18, 1997. Thereafter, subject to the other provisions of this paragraph 6, this Associate Justice position shall be subject to statewide election.

(d) Notwithstanding the provisions of paragraphs 6(a), (b) and (c) above, if on January 1, 1998, there are fewer than two sitting Associate Justices on the Supreme Court of Alabama who either are members of the plaintiff class or who were appointed pursuant to the judicial nominating commission procedure created by this judgment, then the State, as a temporary remedy, shall first determine whether every incumbent Associate Justice whose seat is up for reelection in the 1998 primary, run-off, and general election cycle has qualified under the laws of Alabama to seek reelection for that position. If an Associate Justice does not qualify for any reason by the qualifying deadline for primary elections, then that Justice's position shall become a remedial seat and shall be filled under the procedures set out in paragraph 5(a) above, to serve a term as provided under § 6.15 of Amendment No. 328 to the *Constitution of Alabama*, such term to begin

on January 18, 1999. Thereafter, subject to the other provisions of this paragraph 6, this Associate Justice position shall be subject to statewide election.[5] If, on January 1, 1998, there are fewer than two Associate Justices on the Supreme Court of Alabama who either are members of the plaintiff class or who were appointed pursuant to the judicial nominating commission procedure created by this judgment, and if no Associate Justice fails to qualify for reelection in the 1998 election cycle, then the State shall create and adequately fund an additional Associate Justice position. The Governor shall make an appointment to that position, pursuant to the general procedures set out in paragraph 5(a) above, to serve a term as provided under § 6.15 of Amendment No. 328 to the *Constitution of Alabama*, to begin on January 18, 1999.[6] Thereafter, subject to the other provisions of this paragraph 5, this Associate Justice position shall be subject to statewide election.

(e) Notwithstanding the provisions of paragraphs 6(a), (b), (c) and (d) above, if on January 1, 2000, there are fewer than two sitting Associate Justices on the Supreme Court of Alabama who either are members of the plaintiff class or who were appointed pursuant to the judicial nominating commission procedure created by this judgment, then the State, as a temporary remedy, shall first determine whether every incumbent Associate Justice whose seat is up for reelection in the 2000 primary, run-off, and general election cycle has qualified under the laws of Alabama to seek reelection for that position. If an Associate Justice does not qualify for any reason by the qualifying deadline for primary elections, then that Justice's position shall become a remedial seat and shall be filled under the procedures set out in paragraph 5(a) above, to serve a term as provided under § 6.15 of Amendment No. 328 to the *Constitution of Alabama*, such term to begin

---

5. If more than one Associate Justice fails to qualify for reelection in the year 1998, and if there are no sitting Associate Justices of the Supreme Court who either are members of the plaintiff class or who were appointed pursuant to the judicial nominating commission procedure created by this judgment, then two Associate Justice positions shall become remedial seats under the provisions of this subparagraph.

6. If, after January 1, 1998, and before January 18, 1999, there are at least two sitting Associate Justices on the Supreme Court of Alabama who either are members of the plaintiff class or were appointed pursuant to the judicial nominating commission procedure created by this judgment, then the State shall not be required to implement the additional Associate Justice position provided for in this paragraph.

on January 15, 2001. Thereafter, subject to the other provisions of this paragraph 5, this Associate Justice position shall be subject to statewide election.[7] If, on January 1, 2000, there are fewer than two sitting Associate Justices on the Supreme Court of Alabama who either are members of the plaintiff class or who were appointed pursuant to the judicial nominating commission procedure created by this judgment, and if no Associate Justice fails to qualify for reelection in the 2000 election cycle, then the State shall create and adequately fund an additional Associate Justice position. The Governor shall make an appointment to that position, pursuant to the general procedures set out in paragraph 5(a) above, to serve a term as provided under § 6.15 of Amendment No. 328 to the *Constitution of Alabama,* to begin on January 15, 2001.[8] Thereafter, subject to the other provisions of this paragraph 6, this Associate Justice position shall be subject to statewide election.

(f) At any time when there are, pursuant to subparagraphs (d) and (e) above, more than eight Associate Justices of the Alabama Supreme Court, then the next vacancy on the Court involving an Associate Justice who is not a member of the plaintiff class or appointed pursuant to the judicial nominating commission procedure created by this judgment will not be filled, and said seat will be abolished by operation of this decree. For purposes of this subparagraph only, "vacancy" means the retirement, death, disability, resignation, removal, or failure for any reason of an incumbent Associate Justice to seek reelection.

7. Notwithstanding the remedial provisions in paragraphs 5 and 6 of this judgment, if, after January of 2003 a situation exists on the Supreme Court of Alabama, the Alabama Court of Criminal Appeals or the Alabama Court of Civil Appeals whereby there are fewer than two sitting Associate Justices or

Judges on any such Court who either are members of the plaintiff class or who were appointed pursuant to the judicial nominating commission procedure created by this judgment for more than one year, for any reason, the Hoover White plaintiffs and the State of Alabama shall attempt to agree on an appropriate measure designed to remedy this situation before the next general election cycle. If the parties are unable to agree on a remedial measure, then the plaintiffs reserve the right to petition the Court for appropriate relief.

8. (a) The judgment contained herein resolves any and all claims, causes of action and issues which were asserted in this litigation, including the creation and composition of the Courts of Criminal and Civil Appeals and the Supreme Court of Alabama.

(b) The parties have reserved the right to petition this Court for further relief, or the State may petition this court to terminate this judgment, if the remedial objectives of the judgment have been met or in the event there is a material change in circumstances, facts or law. In determining whether to terminate this judgment, the court shall consider whether members of the plaintiff class or persons appointed pursuant to this judgment have been defeated as a result of racially polarized voting in Alabama or other factors indicating a violation of § 2 of the Voting Rights Act. If the remedial objectives of the judgment have not been met or there is evidence that members of the plaintiff class or persons appointed pursuant to this judgment have been defeated as a result of racially polarized voting in Alabama or other factors indicating a violation of § 2 of the Voting Rights Act, the court shall not terminate this judgment.

9. After the year 1997, the parties may conduct periodic reviews, at least every two years to determine whether the remedial objectives of the judgment are being met.

---

7. If more than one Associate Justice fails to qualify for reelection in the year 2000, and if there are no sitting Associate Justices of the Supreme Court who either are members of the plaintiff class or who were appointed pursuant to the judicial nominating commission procedure created by this judgment, then two Associate Justice positions shall become remedial seats under the provisions of this subparagraph.

8. If, after January 1, 2000, and before January 15, 2001, there are at least two sitting Associate Justices on the Supreme Court of Alabama who either are members of the plaintiff class or were appointed pursuant to the judicial nominating commission procedure created by this judgment, then the State shall not be required to implement the additional Associate Justice position provided for in this paragraph.

After each election cycle, beginning with the 1994 elections for the Alabama Supreme Court, and the Courts of Civil and Criminal Appeals, defendants shall file with the court and serve upon counsel of record, a detailed report of each judgeship of all said courts, including information on all candidates for appellate judgeships.

If a position is not up for election, the report shall so indicate with specificity which position is not up for election and all other information listed below with the exception of election vote total information. The report shall also include voter registration data by race, precinct and county.

The report shall include a summary of election vote totals by race, precinct and county. The report shall also include vote totals for all candidates, financial reports, income, and party affiliation. The report shall also include whether the incumbent initially obtained his/her position by state-wide election, appointment or through the judicial nominating commission process created pursuant to the judgment.

Summaries of the information contained in this report shall be filed with the court. Summaries and the actual data contained on hard copy and computer disk (of the program type usable by plaintiffs) shall be served upon counsel.

10. The State's at-large appellate court system, as modified by this Judgment, shall be submitted forthwith to the Attorney General of the United States for review under Section 5 of the Voting Rights Act of 1965, as amended.

11. This judgment shall terminate following the completion of four judicial election cycles after the 1994 general election. For purposes of this paragraph, a "judicial election cycle" is defined as a six-year period. Within 12 months prior to the expiration date of this judgment the court shall conduct a hearing to determine whether the remedial objectives of the judgment have been met. During the hearing the court shall consider whether members of the plaintiff class or persons appointed pursuant to this judgment have been defeated as a result of racially polarized voting in Alabama or other factors indicating a violation of § 2 of the Voting Rights Act. If the court finds that the remedial objectives of the judgment have been met, it shall make specific findings relating thereto and, thereafter, terminate this judgment. If the court finds that any part of the judgment has not been met it may, in its discretion, extend any portion of the judgment it deems appropriate.

12. The defendant State of Alabama, acting by and through its Comptroller, shall pay to the plaintiffs, directly from the State's General Fund, their reasonable attorneys' fees and costs incurred in this action. The court encourages the parties to attempt to resolve the matter of attorneys' fees and costs first among themselves. If the parties cannot agree upon reasonable attorneys' fees and costs, counsel for the plaintiffs shall petition the court for an award of attorneys' fees and costs within sixty days of the date of this judgment and the same shall be determined by the court. For the purposes of this provision of the judgment, the parties have stipulated that the Hoover White, et al., plaintiff class is "the prevailing party."